**United States Court of Appeals**
**Fifth Circuit**

**F I L E D**

**July 17, 2003**

Charles R. Fulbruge III
Clerk

REVISED AUGUST 25, 2003

UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 02-20097
_____

PETER J. MINIEL,

Petitioner-Appellant,

VERSUS

JANIE COCKRELL, DIRECTOR,
TEXAS DEPARTMENT OF CRIMINAL JUSTICE,
INSTITUTIONAL DIVISION,

Respondent-Appellee.

Appeal from the United States District Court for the
Southern District of Texas, Houston

Before JOLLY, DAVIS and CLEMENT, Circuit Judges.

W. EUGENE DAVIS, Circuit Judge:

Petitioner, Peter J. Miniel (Miniel), was convicted of capital murder in Texas and sentenced

to death. He now seeks a Certificate of Appealability (COA) pursuant to 28 U.S.C. § 2253(c)(2)

from the district court's denial of relief under 28 U.S.C. § 2254 on the following claims: (1) the jury

was precluded from considering mitigating evidence during sentencing; (2) he was denied the right to trial by an impartial jury; and (3) counsel rendered ineffective assistance by failing to conduct a pretrial investigation and present mitigating evidence during sentencing. For the reasons that follow, we deny COA on Miniel's claims.

I.     BACKGROUND.

On October 7, 1988, Miniel was convicted of the felony murder of Paul Manier (Manier).

After arriving at Manier's house to procure marijuana, Miniel concocted a plan to rob him. Miniel's co-defendant, James Warren Russell, Jr. (Russell), distracted Manier by telling him he was going to get cocaine. Manier cleaned a small mirror to use to snort the cocaine. When Manier leaned over the mirror, Miniel struck him on the back of the head with a beer mug. Miniel continued to strike Manier until he fell to the ground. When Russell returned, he joined Miniel and struck Manier several times with a shock absorber that was nearby. Dissatisfied with Russell's efforts, Miniel took the shock absorber and began striking Manier with it. When Miniel could not knock out Manier, he stabbed Manier several times with a small knife. After this proved ineffective, Miniel attempted to slit his throat while Russell held him. Finally, Miniel attempted to asphyxiate Manier by shoving a blanket down his throat.

After the murder, Miniel became angry when he realized that he had killed Manier for only twenty dollars. Miniel and Russell searched the apartment for drugs or money but all they could find to steal was stereo equipment. They washed off Manier's blood and hid the knife. Afterwards, Miniel and Russell went to Burger King to eat hamburgers.

A jury convicted Miniel of capital murder. On October 12, 1988, the jury returned affirmative answers to two special issues required for imposition of the death penalty under Texas law, and the

trial court sentenced Miniel to death.

Miniel appealed his conviction to the Texas Court of Criminal Appeals which affirmed his conviction and sentence. *Miniel v. State*, 831 S.W.2d 310 (Tex. Crim. App. 1992). The United States Supreme Court denied his application for a writ of certiorari. *Miniel v. Texas*, 506 U.S. 885, 113 S.Ct. 245 (1992). Thereafter, Miniel sought post-conviction relief in state court, filing a petition for a writ of habeas corpus in 1993 and an amended petition in1996. Judge Larry Fuller, who was not the trial judge, presided over this proceeding. The State filed its answer in March 1999. Both sides filed affidavits, and without conducting an evidentiary hearing, the state district court requested that the parties submit proposed findings of fact and conclusions of law. The state district court adopted the State's proposed findings of facts and conclusions of law and denied relief. The Texas Court of Criminal Appeals adopted this order in December 1999.

Thereafter, Miniel sought post-conviction relief in federal district court pursuant to 28 § U.S.C. 2254. The district court granted the State's motion for summary judgment in October 2001. The district court denied Miniel's motion to alter or amend the judgment. The district court also denied Miniel's request for a COA. Miniel now seeks a COA from this court.

II.     STANDARD OF REVIEW.

Miniel filed the instant Section 2254 application for habeas relief after the April 24, 1996 effective date of the Antiterrorism and Effective Death Penalty Act (AEDPA). His application is therefore subject to AEDPA. *Lindh v. Murphy,* 521 U.S. 320, 336, 117 S.Ct. 2059, 2068 (1997).

Under AEDPA, an appeal may not be taken to this court unless the petitioner first obtains a COA. 28 U.S.C. § 2253(c)(2). "This is a jurisdictional prerequisite because the COA statute mandates that '[u]nless a circuit justice or judge issues a certificate of appealability, an appeal may

not be taken to the court of appeals. . . .'" *Miller-El v. Cockrell,* 123 S.Ct. 1029, 1039 (2003) (citing 28 U.S.C. §2253(c)(1)) . "The COA statute requires a threshold inquiry into whether the circuit court may entertain an appeal." *Id.* (citing *Slack v. McDaniel,* 529 U.S. 473, 482 (2000); *Hohn v. United States,* 524 U.S. 236, 248 (1998)). A COA will be granted only if the petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To make such a showing, a petitioner "must demonstrate that the issues are debatable among jurists of reason; that a court *could* resolve the issues [in a different manner]; or that the questions are adequate to deserve encouragement to proceed further." *Barefoot v. Estelle*, 463 U.S. 880, 893 n. 4, 103 S.Ct. 3383, 3394 n. 4 (1983) (citation and internal quotation marks omitted). Any doubt regarding whether to grant a COA is resolved in favor of the petitioner, and the severity of the penalty may be considered in making this determination. *Fuller v. Johnson*, 114 F.3d 491, 495 (5th Cir. 1997).

The analysis "requires an overview of the claims in the habeas petition and a general assessment of their merit." *Miller-El v. Cockrell,* 123 S.Ct. 1029, 1039. We must look to the district court's application of AEDPA to the petitioner's constitutional claims and determine whether the court's resolution was debatable among reasonable jurists. *Id.* "This threshold inquiry does not require full consideration of the factual or legal bases adduced in support of the claims." *Id.* Rather, "'[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong.'" *Id.* at 1040. (citing *Slack v. McDaniel,* 529 U.S. 473, 484).

In making this assessment, we must be mindful of the deferential standard of review the district court applied to Miniel's claims as required by AEDPA. *Hill v. Johnson,* 210 F.3d 481, 484-85 (5th Cir. 2000). Section 2254(d) requires a federal district court to give deference to

4

determinations by a state habeas court that adjudicated the petition on the merits. *See Hill v. Johnson*, 210 F.3d 481, 484-85 (5th Cir. 2000). Pursuant to 28 U.S.C. § 2254(d), the district court defers to a state court's adjudication of a petitioner's claims on the merits unless the state court's decision was: (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;" or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." A state court's decision is deemed contrary to clearly established federal law if it reaches a legal conclusion in direct conflict with a prior decision of the Supreme Court or if it reaches a different conclusion than the Supreme Court based on materially indistinguishable facts. *Williams v. Taylor,* 529 U.S. 362, 120 S.Ct. 1495, 1519-20 (2000). A state court's decision constitutes an unreasonable application of clearly established federal law if it is objectively unreasonable. *Id.* at 1521.

III.    MITIGATING EVIDENCE.

A.    Denial of Mitigating Evidence Instruction

Miniel argues that the state court denied a jury instruction with respect to the following mitigating evidence in violation of the Eighth Amendment: his drug and alcohol use at the time of the offense; his youth (age 23); his good behavior while incarcerated; and his religious conversion.[1]

---

[1] Miniel also argues that the jury could not adequately consider the "mitigating" evidence of his co-defendant's lesser sentence. The Supreme Court has explained that mitigating evidence involves any aspect of the defendant's character or record and a circumstance of his offense. *See Eddings v. Oklahoma,* 455 U.S. 104, 110, 102 S.Ct. 869, 874 (1982). A co-defendant's lesser sentence does not constitute a mitigating factor as defined by the Supreme Court. *Cf. United States v. Ives,* 984 F.2d 649, 650 (5th Cir. 1993) (relying on the Supreme Court's capital jurisprudence, we have concluded that substantially lesser sentences received by a defendant's coconspirators did not constitute a mitigating circumstance that might warrant downward

5

Finding Miniel's claim precluded by precedent, we deny a COA.

In *Penry I*, the Supreme Court reversed a death sentence on the ground that, although the evidence regarding the defendant's mental retardation and childhood abuse was presented to the jury at the penalty phase of the trial, the special issues prescribed by Texas statute prevented the jury from giving mitigating effect to that evidence. *Penry v. Lynaugh*, 492 U.S. 302, 328, 109 S.Ct. 2934, 2952 (1989). Since the holding in *Penry,* federal courts have had the opportunity to determine whether the special issues provided a vehicle for considering numerous types of mitigating evidence.

As in the instant case, the petitioner in *Tucker v. Johnson,* 115 F.3d 276, 281 (5th Cir. 1997), argued that the jury was prevented from considering the mitigating evidence of her intoxication at the time of the offense and her age, twenty-three. We rejected that claim and found that the petitioner had failed to make a substantial showing of the denial of a federal right. *Id.* at 281-82. More specifically, a jury can give "full effect" to evidence of voluntary intoxication in its determination of whether the defendant acted deliberately, which is contained in the first special issue. *Lackey v. Scott*, 28 F.3d 486, 489 (5th Cir. 1994). The second special issue with respect to future dangerousness affords the jury an adequate vehicle to consider the defendant's youth. *Johnson v. Texas*, 509 U.S. 350, 370, 113 S.Ct. 2658, 2670 (1993).

With respect to the evidence of Miniel's good behavior while incarcerated, the Supreme Court has explained that no special instruction is necessary to enable the jury to consider the mitigating effect of the petitioner's evidence regarding his good prison disciplinary record. *See Franklin v. Lynaugh*, 487 U.S. 164, 108 S.Ct. 2320, 2329-30 (1988). Finally, with respect to Miniel's religious

_____

departure from guidelines sentence).

conversion, this Court has held that the second special issue would allow the jury to give effect to mitigating evidence that a petitioner had "rededicated his life to God." *Jernigan v. Collins,* 980 F.2d 292, 295 (5th Cir. 1992).

Accordingly, Miniel's claim that he was entitled to an instruction to allow the jury to give effect to his mitigating evidence is precluded by precedent. The Supreme Court's decision in *Penry II* does not indicate otherwise. *Penry v. Johnson* 121 S.Ct. 1910 (2001). In *Penry II,* the Supreme Court found a supplemental jury instruction with respect to mitigating evidence to be "ineffective and illogical." *Id*. at 1924. Thus, the Court reached the same conclusion it had reached in *Penry I*: "[A] reasonable juror could well have believed that there was no vehicle for expressing the view that Penry did not deserve to be sentenced to death based upon his mitigating evidence." *Id.* The Court did *not* indicate that we have misinterpreted what constitutes *Penry* evidence.

We are therefore satisfied that no reasonable jurist would find debatable the district court's resolution of Miniel's *Penry II* claim. Accordingly, we deny COA as to this claim.

B.    Mitigating Evidence Not Before the Jury

Miniel also contends that the special issues effectively precluded the introduction of certain other mitigating evidence including: emotional trauma resulting from the circumstances in which he learned of his adoption; his alcoholic father; a long history of severe abuse as a child; a history of drug and alcohol abuse; a pattern of suicide attempts and substance abuse that affected virtually every member of his immediate family; and evidence of impairment of his mental, academic, social, and behavioral functioning. Miniel contends that without a proper instruction the jury would have had no vehicle  through which to give effect to the mitigating weight of this evidence. This Court, however, has repeatedly rejected the claim that the "Texas statutory capital sentencing scheme is

7

invalid as preventing or chilling defense counsel's development of mitigating evidence." *Briddle v. Scott*, 63 F.3d 364, 378 (5th Cir.1995); *Crank v. Collins,* 19 F.3d 172, 176 (5th Cir.1994); *Black v. Collins,* 962 F.2d 394, 407 (5th Cir. 1992); *May v. Collins,* 948 F.2d 162, 166-68 (5th Cir. 1991). Further, we have held that a "petitioner cannot base a *Penry* claim on evidence that could have been but was not proffered at trial." *Boyd v. Johnson,* 167 F.3d 907, 912 (5th Cir. 1999) (citing *West v. Johnson*, 92 F.3d 1385, 1405 (5th Cir. 1996)). We are constrained to find that Miniel has not made a substantial showing of a constitutional right with respect to his *Penry* claim.

IV.     DENIAL OF IMPARTIAL JURY.

Miniel also argues that he was denied his Sixth Amendment right to an impartial jury. The Sixth Amendment right to a fair trial includes the right to an impartial jury. *Morgan v. Illinois*, 504 U.S. 719, 727, 112 S.Ct. 2222 (1992). In a capital sentencing context, a defendant has the right to challenge for cause a juror whose views on capital punishment would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Wainwright v. Witt*, 469 U.S. 412, 424, 105 S.Ct. 844, 852 (1985). A state trial court's refusal of a petitioner's challenge for cause is a factual finding entitled to a presumption of correctness. *Jones v. Butler,* 864 F.2d 348, 362 (5th Cir. 1988). Here, the state habeas court "[found] based on a review of the trial record that the trial court did not err in failing to excuse venireperson Patrick O'Rourke for cause because he clearly demonstrated that he understood the legal definitions, was fully capable of following the law and fairly and impartially answering the punishment issues."

The juror in question, Patrick O'Rourke, had an MBA from the University of Houston and was a comptroller for a corporation. Miniel argues that O'Rourke expressed such an extreme bias in favor of the prosecution and the death penalty that it disqualified him from being seated as an

impartial juror. In support of this argument, Miniel quotes several statements O'Rourke made while being examined during voir dire. First, Miniel asserts that O'Rourke demonstrated his bias by expressing the view that he would not worry about whether the death penalty was right or wrong in a particular case because the decision to execute a convicted defendant is "more or less a mechanical process." During voir dire, in response to the prosecutor's question whether it would "bother" him to be limited to only two choices of punishment (life or death sentence), O'Rourke responded as follows:

> No. I mean what it is is what it is. I don't – at that point it's not the point to be worrying about, whether or not it's right or wrong. It probably is good. Like I said, it's become *more or less a mechanical process that you make these decisions. And this is the result of those decisions: more or less yes-or-no-type*.

We do not read O'Rourke's use of the phrase "more or less mechanical process" as evidencing bias. Instead, we understand O'Rourke's use of the phrase "more or less a mechanical process" as describing the Texas procedure that determines whether a life sentence or death sentence is imposed. The prosecutor explained that, under the statutory scheme, if the issues are answered affirmatively the defendant will be sentenced to death. If there is a negative answer to either question the defendant will be sentenced to life imprisonment. We note that the prosecutor informed O'Rourke that if the jury answered the special answers "yes," an "automatic death verdict" resulted. Webster's Dictionary provides that the word "automatic" is a synonym for "mechanical."[2] Clearly, the jurors' answers to the special issues "automatically" determine the sentence imposed. Accordingly, we are not persuaded that O'Rourke's use of the phrase "more or less mechanical

---

[2] WEBSTER'S NEW RIVERSIDE UNIVERSITY DICTIONARY(1984).

9

process" when describing the statutory scheme gives rise to debate regarding potential bias.

Miniel also points to various other statements made by O'Rourke during voir dire in support of his claim of bias, including the following: (1) he believed that because the "justice system is just all drawn-out" and that "if you speeded up the process, a few innocent might die; but society, as a whole, might be better off"; (2) his "personal feelings [are] that we're probably a little too lenient . . . [and] society has pretty much reined [in] its use"; (3) he did not feel "inclined" to mitigate punishment[3] and thought that "society has the obligation to remove persons who are a danger to society as a whole."

After reading the record, it is clear that O'Rourke held a strong *personal* preference for the death penalty as a punishment for those convicted of capital murder.[4] Nonetheless, O'Rourke's answers also indicated that he understood the difference between his "personal feelings" and what Texas law provided.[5] Under those circumstances, Miniel did not rebut with clear and convincing evidence the state court's finding that O'Rourke "was fully capable of following the law and fairly and impartially answering the punishment issues." Accordingly, the district court's judgment denying this claim is not debatable or wrong.

---

[3] We note that on the juror questionnaire O'Rourke *disagreed* with the following statement as an absolute: "A person is always responsible for his or her acts, and there can be no circumstances that could mitigate his responsibility."

[4] During voir dire, the prosecutor asked O'Rourke to rate himself on a scale from 1 to 5 regarding his attitude toward capital punishment (the number 1 indicating totally opposed to the death penalty and the number 5 indicating strongly in favor of capital punishment as an appropriate penalty). O'Rourke said he would "be more towards the 4 to 5 range."

[5] O'Rourke stated that he understood that "the laws are laid down. You kind of have to operate within the laws."

Miniel further contends that O'Rourke should have been excused for cause because he could not distinguish between the term "intentional," which pertains to the mental state at issue during the guilt-innocence phase and the term "deliberate," which is contained in the first special issue at the punishment phase. The State does not dispute that a prospective juror should be excused if unable to distinguish between those two terms. This Court has noted that Texas law makes "'a distinction between intentional and deliberate conduct; deliberate conduct is something more than intentional, but less than premeditation. [The Texas Court of Criminal Appeals has] repeatedly recognized that a venireperson who cannot distinguish between intentional and deliberate conduct is impaired in his ability to consider the first special issue, and is challengeable for cause.'" *Green v. Johnson*, 160 F.3d 1029, 1037 (5th Cir. 1998) (quoting *Soria v. State,* 933 S.W.2d 46, 60-61 (Tex. Crim. App. 1996)) (internal citation omitted). Nonetheless, Texas law does *not* require that venirepersons find a "distinct" difference between the terms "intentional" and "deliberate." *Goff v. State*, 931 S.W.2d 537, 548 (Tex. Crim. App. 1996). Instead, it "only requires that venirepersons find *a* difference between the two terms and be able to base their answers on the evidence presented." *Id.*

At the beginning of O'Rourke's voir dire examination, the trial court asked him if he had any "scruples" against the death penalty in a "proper case." O'Rourke responded negatively. The trial court then instructed O'Rourke as follows:

> I'm going to give you a definition of "intentionally" and "deliberately."
>
> A person acts intentionally, or with intent, with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result.
>
> There's a different interpretation of the common meaning of

11

"intentionally" and "deliberate' within the context of capital murder punishment hearing.

As used in the first Special Issue, the word "deliberately" has a meaning different and distinct from the word "intentionally."

The word "deliberately," as used in the first Special Issue, means a manner of doing an act characterized by or resulting from careful consideration, a conscious decision involving a thought process which embraces more than mere will to engage in the conduct.

\*        \*        \*

I do want to instruct you that in Texas, under the capital murder statute, there are several different types of capital murder offenses . . . .

The punishment for [capital murder] is life or death. Those are the only two punishments.

There's a difference between "intentional murder" – now, for intentional murder the punishment range is from five years to life. And in no case for just an ordinary intentional murder can a person be given [the] death penalty.

Do you understand that? It has to be some of these plusses connected, like aggravated rape, like I mentioned; you understand?

A. [O'Rourke]        Okay.

Subsequently, the prosecutor described a hypothetical capital murder to O'Rourke and inquired whether he understood the difference between "intentional" and "deliberate" conduct in that scenario. O'Rourke replied "Not really." The prosecutor inquired as follows: "I gather if you believe that he intentionally shot and killed somebody with the intent of killing, causing a death, you're going to answer Issue No. 1 yes; the legal distinction between 'intent' and 'deliberate' doesn't have a whole lot of meaning to you[?]" O'Rourke responded that the "more you talk about it, the

12

more *commingled* they become. That's what I have to admit." (emphasis added). O'Rourke also stated that the "words do start crossing over a lot, yea; so I'd have to say yes." The prosecutor further inquired: "If you find him guilty, odds are that Issue 1 is going to be a big yes?" O'Rourke responded "Odds are, yeah."

As set forth above, O'Rourke described the two terms as "crossing over a lot" and becoming "more commingled." However, these descriptions do not suggest that O'Rourke found the terms identical; instead, these descriptions suggest *some* difference (even if not distinct) between them. Moreover, his response that the "odds" were that he would answer yes to the first special issue after finding the conduct intentional certainly does not indicate that he would do so in every case.

As previously quoted, the state habeas court found "based on a review of the trial record that the trial court did not err in failing to excuse venireperson Patrick O'Rourke for cause because he clearly demonstrated that he understood the legal definitions, was fully capable of following the law and fairly and impartially answering the punishment issues." Because O'Rourke's responses indicated that he perceived some difference between the two terms and that he would base his answers on the evidence presented,[6] Miniel has not shown that O'Rourke was excusable for cause under Texas law. *Goff v. State*, 931 S.W.2d 537, 548. The district court was unpersuaded that Miniel has rebutted the state court's finding with clear and convincing evidence. Given the presumption afforded both the trial court and the state habeas court, we do not believe that the district court's decision was debatable or wrong. Accordingly, we find that Miniel has not made a substantial showing of the denial of a constitutional right with respect to this particular argument, and we deny COA on this

---

[6] O'Rourke expressly stated that he would answer the questions depending on the "facts and circumstances."

13

basis.

Finally, Miniel contends that the prosecutor's remarks to O'Rourke during voir dire minimized the jury's responsibility for determining a sentence of death in violation of *Caldwell v. Mississippi*, 472 U.S. 320, 104 S.Ct. 2633 (1985). Miniel argues that the prosecutor's remarks regarding the extensive, lengthy review of a death sentence by the courts would lead a juror to believe that the responsibility is delegated to the courts.

In *Caldwell,* the Supreme Court "conclude[d] that it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." 472 U.S. 320, 328-29. Subsequently, in *Dugger v. Adams,* 489 U.S. 401, 407, 109 S.Ct. 1211, 1215 (1989), the Supreme Court explained that to "establish a *Caldwell* violation, a defendant necessarily must show that the remarks to the jury improperly described the role assigned to the jury by local law." During Miniel's state habeas proceedings, the trial court found "no evidence in the record to support [Miniel's] assertions that the State misstated the law in voir dire or impermissibly minimized the jury's responsibility for the death sentence."

To evaluate a *Caldwell* claim, this Court looks to the "'total trial scene,' including jury selection, the guilt phase of trial, and the sentencing hearing, examining both the court's instructions and counsel's argument to the jury." *Montoya v. Scott,* 65 F.3d 405, 420 (5th Cir. 1995) (quoting *Sawyer v. Butler*, 881 F.2d 1273, 1286-87 (5th Cir. 1989)).

The challenged remarks were made during the following questioning by the prosecutor:

> Q.   Do you regard [the death penalty] as a deterrent to any type
>      of crime?

14

A.   Well, it certainly prevents reoccurrence.

Q.   It substantially impairs the one executed; I agree.  But as to other individuals?

A.   Yeah, in certain – in certain instances; I don't think it deters it all the time, because sometimes it's not a thinking process; but, certainly, where it is a premedi[t]ated process, I think it would certainly be a situation.  If not, someone is not thinking ahead very far.

Q.   As you know, as you sit here now, if some other jury in this courthouse rendered a death verdict today – there are . . . two or three other capital trials going on presently.  You surely know it would take years and years and years before that sentence was ever carried out.  *It would go through the Texas Court of Criminal Appeals and then the United States Supreme Court and then back through various State and Federal courts; and probably fifty judges will look at that thing before, ten years from today, they finally come down on one side or the other and say, "Yeah, you're going to execute him" or "No, You're not; retry him or something else."*

Does it bother you, as a juror, knowing that whatever decision you make is going to be like an annuity policy that one day is or is not going to happen?

A.   I think it bothers me as a citizen; not necessarily as a juror.

Q.   How does it bother you as a citizen?

A.   I think that– I think that the justice system is just all drawn-out.  If a few – granted, if you speeded up the process, a few innocent might die; but society, as a whole, might be better off.

Q.   Did you sincerely believe what you just said: that even though a few not guilty might get burned in the process, we might be better off to go ahead and speed this thing up?

A.   I think it's pretty fundamental to society.  I think if you look back at history, you have people – you can trace it all the way back to the French Revolution, where, certainly, many

15

> innocents were called, but perhaps the French people were
> better off.

(emphasis indicating challenged remarks).

The State argues that the challenged "comments were clearly designed to gauge whether a potential delay in the administration of the death penalty would affect O'Rourke's belief in the deterrent value of capital punishment, and were not meant to reduce O'Rourke's feelings of responsibility in assessing a sentence." This court has looked to the "context" of a prosecutor's remarks in determining a claim of *Caldwell* error. *See Stringer v. Jackson*, 862 F.2d 1108, 1111 (5th Cir. 1988), (opining that the petitioner had taken the prosecutor's comments out of context in that the prosecutor "was explaining to a juror that the law required that his questions be precise, not arguing that higher authorities substituted their discretion for that of the jury on the matter of punishment"), *vacated and remanded on other grounds,* 503 U.S. 222, 112 S.Ct. 1130 (1992). In the case at bar, O'Rourke, as previously indicated, was a highly educated prospective juror who engaged in some philosophical debate with the attorneys regarding the death penalty during voir dire. As such, the State's characterization of the context in which the remarks were made is fair. The district court agreed, finding this to be a "reasonable reading of the prosecutor's comments."

Moreover, the challenged remarks were made during voir dire, "greatly reducing the chance that they had any effect at all on sentencing." *Byrne v. Butler,* 845 F.2d 501, 508 (5th Cir. 1988). Indeed, during closing argument at the sentencing phase, the prosecutor highlighted the jury's responsibility in determining whether Miniel received a sentence of death:

> thank heavens the *juries make these decisions*. It's not right that prosecutors make decisions that people ever die. You don't want Governments going out and saying, "This person should die, and this person should." Before anybody should get a death sentence, they

16

should come to the juries, come to the people, and say, "Yeah, you have my permission before the Government ought to do anything."

(emphasis added).  Similarly, defense counsel stated to the jury that after closing argument, "you'll be required to answer these two questions that will determine whether or not this boy dies or lives in confinement in a society where he will not, based upon the evidence beyond a reasonable doubt, be a continuing threat."[7]

In light of the context of the remarks by the prosecutor, the proper instructions given by the court at voir dire and sentencing, the closing arguments at the sentencing phase highlighting the jury's responsibility, and O'Rourke's obvious grasp of the sentencing scheme, the statements would not lessen a juror's sense of responsibility in determining the answers to the punishment issues.

In view of the deference afforded the trial court's credibility determination and the presumption accorded the state habeas court's factual finding under Section 2254(e)(1) with respect to the failure to excuse a juror for cause,[8] the federal habeas court was unpersuaded that Miniel rebutted the presumption with clear and convincing evidence.  We perceive nothing in the district court's judgment which would give rise to a reasonable debate on this issue.  Accordingly,  we find that Miniel is not entitled to a COA with respect to this claim.

V.    INEFFECTIVE ASSISTANCE OF COUNSEL.

Miniel next argues that trial counsel's failure to investigate and develop mitigating evidence

---

[7] Counsel also stated that "[n]ever, never, never, again, . . . will you have the power over the life of another human being, as you have now."

[8] We note that Miniel argues that the trial court abused its discretion in failing to excuse O'Rourke.  The case Miniel cites for this proposition is a case on direct appeal to this Court.  *See United States v. Hall,* 152 F.3d 381 (5th Cir. 1998).  As previously set forth, this federal habeas case is controlled by the standards set forth in AEDPA.

17

amounted to constitutionally ineffective assistance requiring that his sentence be vacated. Under *Miller-El v. Cockrell, supra,* we must conduct a threshold inquiry into the merits of Miniel's claim to determine whether reasonable jurists would find the federal habeas court's resolution of this claim debatable or wrong.

Under *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052 (1984), Miniel was required to prove that trial counsel's performance failed to meet generally accepted standards of competence and that there is a reasonable probability that the outcome of his case was affected by counsel's deficient performance. While the court in *Strickland* recognized that there is a broad range of professionally competent conduct in the trial of any case, generally accepted standards of competence require that counsel conduct an investigation regarding the accused's background and character. *Williams v. Taylor,* 529 U.S. 362, 128 S.Ct. 1495 (2000). Miniel contends that, had his trial counsel performed even the most rudimentary investigation, he would have found ample mitigating evidence to present during the penalty phase of his trial.[9]

During the penalty phase of Miniel's trial, the State presented five witnesses, four of whom testified regarding Miniel's past criminal history in Illinois. The fifth witness was a police officer from Humble, Texas who testified regarding Miniel's bad reputation in the community for violence. Miniel's trial counsel presented three witnesses. The first was a corrections officer who testified that Miniel had not presented any disciplinary problems during his incarceration. The second was a venireperson who had not been selected for Miniel's jury and who had visited Miniel several times

---

[9] See the Supreme Court's recent decision in *Wiggins v. Smith*, No. 02-311, 2003 WL 21467222 (2003), where the court emphasized that counsel had a duty under *Strickland* to make a reasonable investigation to uncover mitigating evidence.

in jail. The third was an assistant chaplain working at the jail who testified about Miniel's attendance at church services. None of Miniel's witnesses knew him before October 1998.

Miniel contends that trial counsel should have had him examined to determine whether he suffered from a mental or psychological disorder which would have provided an additional source of mitigation. In support of his state habeas petition, Miniel submitted a neuropsychological and psychological evaluation. Miniel was diagnosed as suffering from moderate impairment of his mental, cognitive, academic, social, and behavioral functioning. According to the evaluation, he has mild to moderate brain damage. Because of these disorders, Miniel has limited ability to use good judgment or reason in making his decisions and exhibits impulsive behaviors. However, nothing in the report or in any other document submitted by Miniel suggests that counsel was or should have been alerted to these problems.

Moreover, Miniel's trial counsel, Mr. Fred Heacock, explains in his affidavit that Miniel was tested by the State's psychologist and found to be competent to stand trial and found to have been competent at the time his crime was committed. He also states that Miniel was lucid and conversant during their meetings. Under these circumstances, there is nothing in the record to suggest that counsel should have been alerted to a potential mental problem. We have held that counsel is not constitutionally ineffective for insufficiently investigating a defendant's mental or psychological condition when there is nothing to put counsel on notice that such a condition exists. *West v. Johnson,* 92 F.3d 1385, 1409, n. 46 (5th Cir. 1996). Thus, the district court's resolution of the issue of whether counsel was ineffective for failing to investigate and present evidence of Miniel's mental condition is not debatable or wrong.

Miniel also contends that his deprived and abusive family history would have also provided

19

a fertile source of mitigating evidence if his trial counsel had interviewed family members. In support of this contention in his state habeas proceeding, Miniel introduced the affidavits (Miniel's Affidavits) of several relatives and friends: Jesse Miniel (adoptive mother), Manuel Miniel (adoptive father), Maria Juana Miniel (adoptive sister), John Miniel (adoptive brother), Maria Secoro Leblanc (adoptive sister), Mary Margaret Miniel (adoptive sister), Carmen Cantu (biological mother), Sookie Leblanc (adoptive sister), David Hernandez (cousin), and Rosa Hunt (friend).

Miniel's Affidavits paint a picture of a rough childhood. Miniel's biological mother, Carmen Cantu, abandoned him when he was only a few days old. He was adopted by his aunt and uncle, Jesse and Manuel Miniel. He grew up in a house with six adoptive siblings in Rock Falls, Illinois, and his parents often fought over his father's drinking and philandering. They also fought over Manuel's treatment of Miniel. Manuel frequently beat Miniel from the time he was very young and some of these beatings were severe. In addition to the physical abuse, the children suffered from neglect. Jesse worked at a factory at night, leaving Manuel alone with the children. Manuel admits that he was an alcoholic and that he would often go to bars when Jesse was working. He would sometimes leave his children alone in the car outside a bar for hours at a time, even during the harsh Illinois winters. Other times, he would leave them alone in the house.

Jesse, Manuel and Mary Margaret spent the month before Miniel's trial in Houston. They left right after the jury was selected, purportedly at Miniel's request. In their affidavits, both Manuel and Jesse state that, while in Houston, they tried to meet with Miniel's lawyer, Mr. Heacock, but he was always too busy to see them. Consequently, the only contact they had with Heacock while in Houston was a short meeting outside of the courtroom. Jesse notes that during this brief meeting Heacock simply reassured them that things were going smoothly. Jesse and Mary Margaret both note

20

that Heacock never asked any questions about Miniel and never asked if they were willing to testify on his behalf. Similarly, Miniel's sister, Mary Juana, states that she called Heacock at least three times before the trial, left messages each time, but he never returned her calls. Mary Juana asserts that she wanted to help in any way she could and wanted to know how Miniel was doing.

In response, the State submitted the affidavit of Mr. Heacock. Heacock's statements conflict with Miniel's Affidavits. Heacock states that he told Jesse and Mary Margaret that someone should ask the jury to spare Miniel's life and that they refused to testify. Heacock states that Mary Margaret did not testify because she did not want to get involved. This testimony is in conflict with Mary Margaret's affidavit in which she states that she was never asked to testify. It also conflicts with Jesse's affidavit in which she states that she was never asked to testify. Heacock also claims that the family left after hearing part of the prosecution's case, but Jesse and Mary Margaret both assert that they left right after the jury was selected. Jesse claims they left because Miniel asked them to do so, while Heacock suggests that they left because they "had had enough" of the trial. Heacock also denies that he refused to talk to Miniel's family. Manuel, Jesse, Mary Margaret and Mary Juana each claim that they made attempts to contact Heacock and that he was too busy to make time for them or failed to return their calls.

In denying Miniel's petition for habeas relief, the state habeas court credited Heacock's statements that he spoke to Miniel's family members who were present for part of his trial and that these family members did not want to get involved and that they did not appear to have warm feelings about Miniel. The state court also found that none of Miniel's family members indicated that they would have been available or willing to testify and that many had not been present at his trial. Based on these findings, the state habeas court concluded that Miniel failed to show that there were

21

witnesses willing to testify or how that testimony would have benefitted his defense. Thus, the state habeas court ruled that Miniel failed to establish that counsel was ineffective under *Strickland.*

Miniel contends the federal district court erred in deferring to the state habeas court's findings because the state habeas judge (who was not the trial judge) made credibility calls to resolve conflicting affidavits.

We conclude that we need not consider this argument or any other arguments related to counsel's alleged deficient performance under *Strickland's* first prong. Even if the witnesses proffered by Miniel by affidavit had testified at trial about Miniel's abusive background, Miniel has not made a substantial showing that the jury would have answered the special issues any differently. Both the state habeas court and the federal district court determined that Miniel's ineffective assistance claim fails for a lack of prejudice. Based on our review, we conclude that jurists of reason could not debate the correctness of this determination.

During the punishment phase of Miniel's trial the State introduced evidence of numerous previous offenses committed by Miniel in Illinois, including aggravated battery from beating his girlfriend, another charge of aggravated battery, two unlawful use of weapons charges, a retail theft charge, and a charge of disorderly conduct. The State also presented evidence of Miniel's poor parole history and evidence that Miniel did not have a reputation as a peaceful and law abiding citizen. Also, the State produced evidence during the guilt phase that at the time of his arrest Miniel confronted the police with a shotgun and only dropped his weapon in response to his sister's pleas.

When we compare Miniel's violent history including the cruel manner in which he killed Manier with the potential testimony of his family members that centered on his childhood abuse and substance abuse, we are satisfied there is no reasonable probability that the jury would have answered

22

the special issues in a different manner.[10]   As the district court concluded, "Miniel's past

   [10]  Miniel's Affidavits are mild when compared to the evidence presented by the petitioners in *Wiggins v. Smith, supra,* and *Williams v. Taylor, supra*, in support of their ineffective assistance of counsel claims.

   The petitioner in *Wiggins* presented evidence that he was beaten, starved and sexually abused from the time he was a small child.  Wiggins' mother was a chronic alcoholic who often left him and his siblings alone at  home for days at a time, forcing them to beg for food or to eat paint chips and garbage. *Wiggins,* slip op. at 4.  Mrs. Wiggins kept her kitchen under lock and key and would beat the children when they broke into it for food to eat. *Id.*  On one occasion, she pressed the petitioner's hand against a hot stove burner, leading to his hospitalization. *Id.* Wiggins' psycho-sexual abuse began when he was still in his mother's home.  Mrs. Wiggins had sex with men while her children slept in the same bed. *Id.*  At the age of six, the petitioner was put in the foster care system where his physical abuse continued and sexual abuse began in earnest.  He was physically abused by his first two foster mothers. *Id.*  His second foster father repeatedly raped and molested him. *Id.*  The petitioner ran away from his foster home and began living on the streets at the age of sixteen. *Id.*  However, he eventually returned to foster care where he was again sexually abused.  In one placement, his foster mother's sons allegedly gang raped him more than once. *Id.*  After leaving the foster care system, the petitioner entered a Job Corps program. *Id.*  There, he was again sexually abuse, this time by his supervisor. *Id.* Considering the nature and the extent of abuse, the Court found that there was a reasonable probability that a jury would have returned a different verdict. *Id.* at 23-24.

   While Miniel was abused by his father, there is a paucity of evidence on the frequency or severity of the beatings.  Also, there is no evidence of sexual abuse in his family or social history. He was not starved as a child, and Miniel was never shuffled in and out of foster homes.

   The petitioner in *Williams v. Taylor, supra,* also offered considerably stronger evidence of abuse than Miniel. Williams presented evidence of physical abuse, mental retardation, and strong evidence that Williams did not pose a risk of future dangerousness as long as he was incarcerated. Williams presented evidence that his parents were imprisoned for the criminal neglect of him and his siblings. *Id.* at 395.  Williams' juvenile records described a specific incident in which the children were taken from their parents' home and hospitalized. *Id.* at 395, n. 19.  Four of the children were drunk at the time of their removal. *Id*.  The report describes Williams' parents' home as "a complete wreck," with human feces and urine standing in several places throughout the house and with trash and dirty dishes scattered in the kitchen. *Id.*  These records also noted that all of the children were dirty, and none were wearing underpants. *Id.*  Williams' parents were so intoxicated that they could not clothe the children so that they could be taken to the hospital. *Id.*  There was also evidence that Williams had been severely and repeatedly beaten by his father. *Id.* at 395.  After the children were removed from their parents' home, Williams spent two years in the foster care system, including one stretch in an abusive foster home. *Id.*  The children were returned to their parents after their release from prison. *Id.*  Williams was borderline mentally retarded and did not advance past the sixth grade in school. *Id.* at 396.  Williams also presented evidence that he had been a model prisoner during a prior incarceration.  Williams' prison records

violent behavior would overwhelm any of the proposed mitigating evidence in determining future dangerousness. . . Miniel has failed to present 'evidence of sufficient quality and force to raise a reasonable probability that, had it been presented to the jury, a life sentence would have resulted.'" See *Andrews v. Collins*, 21 F.3d 612, 624 (5th Cir. 1994), *cert. denied* 513 U.S. 1114, (1995); *Miniel v. Cockrell,* No. H-00-4361, p.114 (S.D. Tex. filed November 13, 2001).

Based on the strength of the state's case, the state court determined that trial counsel did not render ineffective assistance in failing to present mitigating evidence because Miniel could not show prejudice. The federal habeas court concluded that the state court's determination of this issue is not contrary to or an unreasonable application of federal law. See 28 U.S.C. §2254(d)(1). We find nothing debatable or wrong with this conclusion.

VI. CONCLUSION.

For the reasons stated above we deny the petitioner's request for a COA on his claims that: (1) he was denied a jury instruction with respect to mitigating evidence and that he was precluded from introducing other mitigating evidence in violation of the Eighth Amendment; (2) he was denied

---

contained commendations for helping to break up a prison drug ring and for returning a prison guard's missing wallet. *Id.* Prison officials testified during his state habeas hearing that Williams was "among the inmates least likely to act in a violent, dangerous, or provocative way." *Id.* (Internal quotations omitted). A certified public accountant who frequently visited Williams as part of the prison ministry program testified that "Williams 'seemed to thrive in a more regimented and structured environment.'" *Id.* This is consistent with the opinion of the State's trial expert that was revealed during Williams' state habeas proceeding that "if kept in a 'structured environment,' [he] would not pose a future danger to society." *Id.* at 371.

The mitigating evidence proffered by Miniel is also mild by comparison to that presented by Williams. Miniel proffered no evidence tending to rebut the State's evidence that he posed a significant risk of future dangerousness. The nature and extent of the abuse Miniel experienced was far less severe than that described in *Williams*. Moreover, Miniel has not presented comparable evidence suggesting that retardation lessened his culpability.

his Sixth Amendment right to an impartial jury; and (3) he was denied his Sixth Amendment right to effective assistance of counsel.

COA denied.