# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

April 18, 2012

No. 10-70011

Lyle W. Cayce
Clerk

MARIO SWAIN,

Petitioner - Appellant

v.

RICK THALER, DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL
JUSTICE, CORRECTIONAL INSTITUTIONS DIVISION,

Respondent - Appellee

Appeal from the United States District Court
for the Eastern District of Texas
U.S.D.C. No. 6:06-cv-00425-mhs

Before DAVIS, SMITH, and DENNIS, Circuit Judges.

PER CURIAM:[*]

A Texas jury convicted Mario Swain of capital murder and sentenced him
to death for the 2002 killing of Lola Nixon. Having obtained no relief from his
conviction or sentence in Texas state courts, Swain turned to the federal courts
for habeas relief. The district court denied Swain's habeas petition, *see Swain
v. Thaler*, No. 6:06cv425, 2010 WL 1376910 (E.D. Tex. Mar. 31, 2010); but it
granted a certificate of appealability on the following three issues, which Swain

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not
be published and is not precedent except under the limited circumstances set forth in 5TH CIR.
R. 47.5.4.

No. 10-70011

pursues in this appeal: (1) whether the introduction of Swain's confessions at trial violated his right to due process and privilege against self incrimination; (2) whether Swain's trial counsel rendered ineffective assistance of counsel by failing to adequately investigate evidence in mitigation of the death penalty; and (3) whether Swain defaulted his claim that the prosecution's use of a procedure known as a "jury shuffle" violated the Equal Protection Clause—and if he did not default this claim, whether he is entitled to relief. Swain has not shown that he is entitled to relief on any of these three grounds; therefore, we AFFIRM the district court's denial of his habeas petition.

## I.

On December 28, 2002, Lola Nixon's friends contacted the police after Nixon did not show up for dinner the night before and they could not locate her the next day. Police went to Nixon's house on Iris Circle in Longview, Texas, and discovered evidence of forced entry and blood throughout the house. The police focused their investigation on a truck that one of Nixon's neighbors reported was parked in front of a vacant house on Nixon's block the night before. The truck was registered to Mario Swain's grandfather, and when the police spoke with him, he told them that Swain had been using the truck.

Detective Terry Davis spoke with Swain on the phone, and Swain told him that he could come speak with him where he worked, at a residential treatment home. Detective Davis and Detective Jim Nelson drove to the address that Swain had given and Swain's grandfather's truck was parked in the driveway. Swain came out and met them in front of the open garage door. They asked him why his truck was seen parked on Iris Circle the night before, and Swain told them that he had gone riding with a friend and ended up parking his truck there. One of the detectives told Swain that this was his opportunity to come clean, which prompted Swain to give the following account: The night before, he and a man named Casey Porter broke into a house on Iris Circle; when the

owner came home, Porter attacked her; they put the woman, who was alive but unconscious, in the trunk of her car and drove to a remote location near the airport where they left her. Swain agreed to take the detectives to the place where he said that he and Porter had left the woman. Swain rode in the back of the detectives' car and directed them to a field where they discovered blood, a black trash bag, and a piece of a tire jack, but they did not find Nixon. Detective Davis testified that he did not recall handcuffing Swain at any point while they were at Swain's workplace or while Swain rode in their car, and that he administered *Miranda* warnings to Swain when Swain got into the detectives' car. Detective Nelson testified that he handcuffed Swain at some point "when we were in the garage talking" and that "[a]t that point, we told him we were going to detain him."

The detectives then brought Swain to the Longview Police Department. There, he was read his *Miranda* rights again and he gave several written statements. In his first statement—which included an acknowledgment that Swain had the "right to remain silent and not make any statement at all and . . . the right to [have] a lawyer present"—Swain admitted that he participated in burglarizing Nixon's house, but accused Porter alone of assaulting her. The police arrested Porter, but soon discovered that he had an alibi. The detectives confronted Swain with this information and after they informed him of his rights again, Swain provided a second written statement. This statement also included an acknowledgment "that I have the right to remain silent" and "to have a lawyer present." Swain again admitted to participating in the burglary; however, this time, Swain claimed that a man named Brian Mason Woods was his accomplice and that Woods had assaulted the victim. As with Porter, the police questioned Woods and discovered that he had an alibi.

Several hours later, Swain was charged with burglary of a habitation and was brought before a magistrate who read him his rights in accordance with

No. 10-70011

Texas law.[1]  Swain was then brought to the district attorney's office where a different detective and an investigator with the District Attorney's Office questioned him.  He agreed to lead them to Nixon's body, and directed them to a vehicle containing her corpse that was close to where he had first led Detectives Davis and Nelson.  Nixon had been beaten over the head and stabbed in the chest.  The medical examiner later testified that the cause of death was "homicidal violence, including sharp force injuries, blunt force injuries, and probable strangulation."

After disclosing the location of Nixon's body, Swain was brought back to the Longview Police Department.  There, Detective Davis read him his rights again and Swain gave a third written statement.  As with the previous two statements, this statement included an acknowledgment of "the right to remain silent" and "the right to have a lawyer present."  This time, Swain admitted that he had committed the burglary on his own.  He also stated that the burglary ended in a struggle with Nixon when she returned home; that he bludgeoned her with a tire tool and placed her semi-conscious body into the trunk of her car; and that he drove her to a field and left here there while she was breathing but barely conscious.  Later, police found the tire tool that Swain had used to bludgeon Nixon; they also searched Swain's truck and found clothing with Nixon's blood on it and Nixon's car keys and garage door opener.

Swain was tried for capital murder and, over his objection, his several statements were introduced against him.  After a three-day trial, a jury found

---

[1] *See* Tex. Code Crim. Proc. art. 15.17(a) ("The magistrate shall inform in clear language the person arrested, either in person or through the electronic broadcast system, of the accusation against him and of any affidavit filed therewith, of his right to retain counsel, of his right to remain silent, of his right to have an attorney present during any interview with peace officers or attorneys representing the state, of his right to terminate the interview at any time, and of his right to have an examining trial.  The magistrate shall also inform the person arrested of the person's right to request the appointment of counsel if the person cannot afford counsel.  The magistrate shall inform the person arrested of the procedures for requesting appointment of counsel.").

No. 10-70011

him guilty and sentenced him to death. The Texas Court of Criminal Appeals (TCCA) upheld Swain's conviction and sentence; and the Supreme Court denied review. *Swain v. State*, 181 S.W.3d 359 (Tex. Crim. App. 2005), *cert. denied* 549 U.S. 861 (2006). The TCCA later denied Swain's state habeas application. *Ex parte Swain*, No. WR-64437-01, 2006 WL 2706768 (Tex. Crim. App. Sept. 20, 2006) (unpublished). Swain then filed a petition for federal habeas relief, which the district court denied. *Swain v. Thaler*, No. 6:06cv425, 2010 WL 1376910 (E.D. Tex. Mar. 31, 2010). The district court granted a COA on three issues, which are the subject of this appeal.

## II.

"This habeas proceeding is subject to the Antiterrorism and Effective Death Penalty Act (AEDPA), 28 U.S.C. § 2254 . . . ." *Maldonado v. Thaler*, 625 F.3d 229, 235 (5th Cir. 2010). "Under AEDPA, if a state court has adjudicated a habeas petitioner's claims on the merits, he may receive relief in the federal courts only where the state court decision [1] 'resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States,' or [2] 'resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Id.* (quoting *Rivera v. Quarterman*, 505 F.3d 349, 356 (5th Cir. 2007), in turn quoting 28 U.S.C. § 2254(d)) (internal quotation marks omitted).

"A decision is contrary to clearly established law if the state court 'applies a rule that contradicts the governing law set forth in [Supreme Court] cases.'" *Lafler v. Cooper*, --- S. Ct. ---, 2012 WL 932019, at *11 (U.S. Mar. 21, 2012) (alteration in original) (quoting *Williams v. Taylor*, 529 U.S. 362, 405 (2000) (opinion for the Court by O'Connor, J.)). "To merit habeas relief, a state habeas court's application of federal law must be not only incorrect but 'objectively unreasonable.'" *Maldonado*, 625 F.3d at 236 (quoting *Renico v. Lett*, 130 S. Ct.

5

No. 10-70011

1855, 1865 (2010)). "[A] determination of a factual issue made by a State court shall be presumed to be correct [and] [t]he applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

"We review the district court's conclusions of law *de novo*, applying the same standard of review that the district court applied to the state court decision." *Maldonado*, 625 F.3d at 236 (citing *Jones v. Cain*, 600 F.3d 527, 535 (5th Cir. 2010)). "[W]e review the district court's findings of fact for clear error." *Charles v. Thaler*, 629 F.3d 494, 498 (5th Cir. 2011) (quoting *Evans v. Cain*, 577 F.3d 620, 622 (5th Cir. 2009)) (internal quotation marks omitted).

## III.

### A.

The first issue on which the district court granted a COA is whether the introduction of Swain's confessions at trial violated his right to due process and privilege against self incrimination. Swain contends that in order to secure Swain's confession, Detectives Davis and Nelson deliberately circumvented the prophylactic warnings established in *Miranda v. Arizona*, 384 U.S. 436 (1966), by questioning him first, before they informed him of his rights; and only once he had confessed, did they give him *Miranda* warnings before questioning him again. Swain argues that this question-first interrogation procedure violates *Miranda* as explained in *Missouri v. Seibert*, 542 U.S. 600 (2004). The TCCA held that the introduction of Swain's statements at trial did not violate his constitutional rights.[2] We first conclude that this decision was not based on an

---

[2] In addition to rejecting Swain's *Seibert* claim on the merits, the TCCA determined that Swain procedurally defaulted this claim. *See Swain*, 2010 WL 1376910, at *4. The Respondent urges us to affirm the denial of this claim on the basis of procedural default. However, we choose to resolve this claim on the merits because it is clear to us that the claim "can be resolved more easily by looking past any procedural default." *Busby v. Dretke*, 359 F.3d 708, 720 (5th Cir. 2004) ("Although the question of procedural default should ordinarily be considered first, we need not do so invariably . . . . In this case, we believe that [the

unreasonable determination of the facts in light of the evidence presented in the state court proceeding. We also conclude that this decision was not contrary to, nor did it involve an unreasonable application of, clearly established federal law, as determined by the Supreme Court. Accordingly, Swain has not shown that the district court erred in denying him habeas relief on this claim.

In *Miranda v. Arizona*, the Supreme Court held that the statements a defendant gives during custodial interrogation are inadmissible at trial unless, "[p]rior to questioning, [the] suspect '[is] warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed.'" *J.D.B. v. North Carolina*, 131 S. Ct. 2394, 2401 (2011) (quoting *Miranda*, 384 U.S. at 444); *see also United States v. Courtney*, 463 F.3d 333, 336 (5th Cir. 2006) ("[S]tatements obtained during a custodial interrogation without providing adequate warnings under *Miranda* are inadmissible."). Thus, the necessity of administering *Miranda* warnings prior to police questioning depends on the custodial nature of the interrogation. *Courtney*, 463 F.3d at 336 ("[A] defendant who voluntarily gives a statement to law enforcement in a non-custodial situation need not be advised of his *Miranda* rights." (citing *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977))).

In *Missouri v. Seibert*, "the Supreme Court addressed 'a police protocol for custodial interrogation that call[ed] for giving no warnings of the rights to silence and counsel until interrogation has produced a confession,'" at which point the interrogating officer would administer "'*Miranda* warnings and then lead[] the suspect to cover the same ground a second time.'" *Courtney*, 463 F.3d at 336 (quoting *Seibert*, 542 U.S. at 604). The *Seibert* Court held that

petitioner's] . . . claim can be resolved more easily by looking past any procedural default. Accordingly, we shall assume that the claim is not defaulted."(internal quotation marks and citations omitted)).

"statements obtained through the use of this technique are inadmissible." *Seibert*, 542 U.S. at 604; *id.* at 618 (Kennedy, J., concurring in the judgment). However, we have recognized that "*Seibert* only applies if the first statements were obtained in violation of *Miranda*." *Courtney*, 463 F.3d at 336. In sum, if Swain's initial, oral statements, which were obtained during police questioning without *Miranda* warnings, were given in a non-custodial situation, then neither *Miranda* nor *Seibert* required the suppression of those statements or Swain's later, written statements, which were given following *Miranda* warnings.

The pertinent question then is whether Swain was in custody during the initial police questioning at his place of employment. "A suspect is 'in custody' for purposes of *Miranda* 'when placed under formal arrest or when a reasonable person in the suspect's position would have understood the situation to constitute a restraint on freedom of movement of the degree which the law associates with formal arrest.'" *Id.* at 337 (quoting *United States v. Bengivenga*, 845 F.2d 593, 596 (5th Cir. 1988) (en banc)); *see also Berkemer v. McCarty*, 468 U.S. 420, 442 (1984) ("[T]he only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation."). The TCCA determined that Swain's "initial conversation occurred before Swain was taken into custody or arrested and was voluntarily given." Swain argues that this decision entitles him to habeas relief on two grounds under 28 U.S.C. § 2254(d).

First, Swain contends that the TCCA's decision was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. *See* 28 U.S.C. § 2254(d)(2). Swain attacks the TCCA's decision because it "never accurately addressed or reconciled the testimony surrounding Swain's driveway and backseat interrogation, confessions and warnings[,] . . . did not identify which testimony it viewed more credible," and did not "pinpoint when (1) Swain was handcuffed, (2) taken into custody, or (3) Mirandized." Swain Br. 33-34. He argues further that "[t]here are no state

court findings that Det. Nelson handcuffed Swain *after* any of his four incriminating oral statements." *Id.* at 34. At bottom, Swain contends that the evidence presented in the state proceedings proves that he was handcuffed *before* he was initially questioned by Detectives Davis and Nelson in front of his workplace. *See, e.g., id.* at 34 ("Davis was vague and uncertain on precisely when Swain was handcuffed and Mirandized, while Nelson was certain . . . . Nelson handcuffed Swain and then Davis questioned him . . . ."). We disagree.

Contrary to Swain's assertions that Detective Nelson was certain about handcuffing Swain before the initial questioning, Detective Nelson's trial testimony is entirely vague about when he handcuffed Swain. The pertinent part of Detective Nelson's testimony, upon which Swain relies, is as follows:

> Q. Now, did you -- at some point, did you handcuff Mr. Swain?
> A. Yes, I did.
> Q. When was that?
> A. That was when we were in the garage talking.
> Q. Okay. So you're in the garage talking --
> A. Yes, sir.
> Q. -- and you handcuff him.
> A. I did. I told him we were going to detain him for further investigation. He was moving around quite a bit, walking around in the garage. I didn't know if he was going to -- if he was just nervous or he was going to attempt to flee on us, so I handcuffed him.
> Q. And he wasn't free to go at that point.
> A. At that point, we told him we were going to detain him, yes, sir.
> Q. Which means he's not free to go.
> A. No, sir.

This brief testimony does not indicate with any certainty that Detective Nelson handcuffed Swain *before*, as opposed to *after*, he had made incriminating statements about participating in the burglary.

Moreover, Detective Nelson's testimony that immediately followed may suggest that Swain was handcuffed *after* his confession:

No. 10-70011

A.    After Mr. Swain told Detective Davis and I that he had participated in the burglary of the victim's residence -- and we asked him -- and he also says that they took items from the residence, we asked if had any of that property on his person as that time.

Then he says that he had some 50-cent pieces that he took from the house that were in his jacket pocket. *We asked him to retrieve them.* He said that it was okay for us to take them out of his pocket, which we did.

(emphasis added). Swain points to the last line of Detective Nelson's testimony and argues, "Det. Nelson explained that he lifted the fifty-cent coins from Swain's coat pocket[,] [and] [t]he only reason this would be necessary would be if Nelson had already handcuffed Swain, who could no longer reach the pockets." Swain Br. 30. However, the penultimate sentence, emphasized above, may suggest the opposite: that Swain was not yet handcuffed—otherwise, it is arguable that Detective Nelson would not have asked Swain to retrieve the coins from his pocket. Furthermore, Detective Davis testified that he did not recall handcuffing Swain at any time while they were at the house and speaking with him.

Based on this ambiguous testimony, we cannot say that the TCCA's decision that Swain was not in custody when he made his initial incriminating statements was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.

Next, Swain contends that the TCCA's decision that he was not in custody when he was initially questioned resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law. *See* 28 U.S.C. § 2254(d)(1). Again, we disagree.

As previously explained, the relevant inquiry for "custody" in the context of *Miranda* warnings is whether "a reasonable person in the suspect's position would have understood the situation to constitute a restraint on freedom of

10

movement of the degree which the law associates with formal arrest.'" *Bengivenga*, 845 F.2d at 596 (citing, *inter alia*, *Berkemer*, 468 U.S. at 440, 442). The testimony established the following facts regarding the initial police questioning of Swain in front of his place of employment: After the police determined that Swain had possession of the truck that was seen parked on the victim's block the night of her disappearance, Swain telephoned Detective Davis and told him that he could come speak with him at his work; when the police arrived, Swain agreed to speak with the officers voluntarily; all of the initial questioning occurred in an environment that was familiar to Swain and open to public view; and Swain was free to move around. Moreover, as just described, the testimony does not support Swain's contention that he was handcuffed before this initial questioning. Thus, on this record, Swain has not shown that the TCCA's decision that he was not in custody—and thus, that the introduction of his statements at trial did not violate *Miranda* or *Seibert*—resulted in a decision that was contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court. *See Yarborough v. Alvarado*, 541 U.S. 652, 664-66 (2004).

Thus, we see no error in the district court's decision that Swain is not entitled to habeas relief under 28 U.S.C. § 2254(d) on his claim that the introduction of his statements at trial violated his constitutional rights.

**B.**

The second issue on which the district court granted a COA is whether Swain's trial counsel rendered ineffective assistance of counsel by failing to adequately investigate evidence in mitigation of the death penalty. Swain contends that if his trial counsel had conducted a reasonable investigation, he would have uncovered significant evidence of traumatic events from Swain's childhood and of Swain's psychological problems. Swain argues that had his trial counsel presented this evidence to the jury, the jury would not have

sentenced him to death. We conclude that the TCCA's decision that Swain did not receive ineffective assistance of counsel was not contrary to, and did not involve an unreasonable application of, clearly established federal law.

In *Wiggins v. Smith*, 539 U.S. 510 (2003), the Supreme Court addressed a Sixth Amendment ineffective-assistance-of-counsel claim based on the alleged failure of trial counsel to adequately investigate and present evidence in mitigation of the death penalty. *Id.* at 514. The Court explained that "the legal principles that govern claims of ineffective assistance of counsel [established] in *Strickland v. Washington*, 466 U.S. 668 (1984)," also governed Wiggins' claim. *Wiggins*, 539 U.S. at 521. "An ineffective assistance claim has two components: A petitioner must show that counsel's performance was deficient, and that the deficiency prejudiced the defense." *Id.* (citing *Strickland*, 466 U.S. at 687). "To establish deficient performance, a petitioner must demonstrate that counsel's representation 'fell below an objective standard of reasonableness.'" *Id.* (quoting *Strickland*, 466 U.S. at 688). "[T]o establish prejudice, a 'defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Id.* at 534 (quoting *Strickland*, 466 U.S. at 694).

The TCCA held that Swain's claim failed on both components of the *Strickland* ineffective-assistance standard. The district court, however, "assum[ed] *arguendo* that Swain can demonstrate deficient performance and . . . focus[ed] on the prejudice prong of the *Strickland* test." *Swain*, 2010 WL 1376910, at *8. The district court held that "the state court was not unreasonable in finding that even had Swain presented the evidence of his upbringing and psychological problems, there was not a reasonable probability that at least one juror would have voted to spare his life," and "[a]ccordingly, [that] Swain has failed to show that the state court's decision was contrary to,

or an unreasonable application of, the standards provided by clearly established federal law for succeeding on an ineffective assistance claim." *Id.* at *12. We agree with the district court's conclusion regarding the prejudice prong of Swain's *Strickland* claim, and therefore, we need not address the deficient performance prong. *Day v. Quarterman*, 566 F.3d 527, 536 (5th Cir. 2009) ("If the petitioner fails to prove the prejudice component, the court need not address the question of counsel's performance." (citing *Strickland*, 466 U.S. at 697)).

The district court accurately described the aggravating and mitigating evidence that was presented in the punishment phase of Swain's trial, as well as the mitigating evidence that Swain presented in his habeas proceeding, which was not introduced at trial, but Swain contends was available:

> At the punishment phase of Swain's capital murder trial, the state presented evidence that in January 2001 he assaulted a fourteen-year-old girl named Olivia Torres, and in December 2002 he burglarized the home of a woman named Nicole Anderson, and rendered her unconscious by making her inhale halothane, a general anesthetic. One of Swain's girlfriends, Ashley Russell, testified that Swain spoke to her about knocking out older women at car washes and taking their money, and showed her a bottle of halothane. She also saw a book which Swain kept containing driver's license numbers, car models, and descriptions of women driving the cars.
>
> Crystal Hargett testified that Swain asked her on more than one occasion to help him rob victims. Teresa McNene testified that someone struck her in the back of the head in October 2002 and tried to steal her purse. A month later, someone burglarized her work area, stealing her cosmetologist license and her cordless phone. Another of Swain's girlfriends, Kristie Anderson, testified that Swain brought a cordless phone to his apartment. Anderson gave the phone to Officer Monty Gage, who testified that the serial number on the phone matched the serial number of McNene's phone. Kristie Anderson also testified that she found papers at Swain's apartment with the victim's name and other names, both male and female, addresses, vehicle descriptions, and license plate numbers, written in Swain's handwriting. Betty McDonald testified that in 1999 she was attacked from the back seat of her car by a

man with a taser.    Officer Gregory Stewart testified that fingerprints taken from McDonald's car after the incident were Swain's.

The Defense called five witnesses: Swain's mother, his maternal grandfather and grandmother, one of his jailers, and a criminologist.  Swain's Mother, Mechelle Todd, testified that after he was born the family moved between Long Beach, California, Longview, Texas, and Houston, Texas.  She divorced Swain's father when Swain was five years old and married his stepfather three years later.   She testified that Swain got along well with his stepfather.  When he was twelve years old, Swain moved from his residence in California back to Longview, Texas and lived with his grandparents for about four or five years.  He then moved back to California, but did not like it and returned to Longview.   Both grandparents testified that Swain caused them no trouble, was quiet, obedient and respectful, and attended church regularly.  All three testified that there was good in Swain and that Swain had a good side which was worth saving.  On cross-examination, Swain's grandfather and his mother admitted that they were aware that Swain and another youth were involved in an incident of sexual cruelty involving a cow belonging to Swain's uncle, and his grandfather had to pay the veterinarian bill.  Swain's jailer testified that Swain had not assaulted anyone during the year he had been incarcerated and had not caused trouble other than minor infractions, such as being in the wrong part of the jail at head count time. The criminologist testified to security procedures in the Texas prison system.

During his state post-conviction proceedings, Swain presented a comprehensive social history report from Sheri Stillwell, and a mit[i]gation affidavit from Dr. Kate Allen.   Both are Licensed Clinical Social Workers, and both opined that Swain suffered from post-traumatic stress disorder as a result of (1) seeing his father beat his mother, and (2) being locked in a closet while his father beat his mother, when Swain was a young child.   Swain also suffered from attachment issues as a result of frequent moving and having to share his mother with his stepfather and stepbrother.  Finally, he was sexually abuse[d] when he was six years old by being encouraged to watch pornographic movies by his sixteen-year-old uncle, and he himself began having sexual intercourse at age twelve. Swain's psychological problems appeared serious enough to his mother that she took him to see a psychologist

when he was ten or eleven, but the psychologist told her that nothing was wrong with him. He began engaging in criminal activity (shoplifting) when he was twelve years old.

*Swain*, 2010 WL 1376910, at *8-9 (footnote omitted).

On this record, we cannot say that the TCCA's decision—that there was no prejudice under the *Strickland* formulation in Swain's trial attorney's failure to uncover and present this mitigating evidence to the jury—resulted in a decision that was contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court. In *Miniel v. Cockrell*, 339 F.3d 331 (5th Cir. 2003), this court considered the same type of claim that Swain presents here. In support of his ineffective assistance claim, Miniel had introduced affidavits from several relatives and friends describing the mitigating evidence that Miniel argued was available:

> Miniel's [a]ffidavits paint a picture of a rough childhood. Miniel's biological mother, Carmen Cantu, abandoned him when he was only a few days old. He was adopted by his aunt and uncle, Jesse and Manuel Miniel. He grew up in a house with six adoptive siblings in Rock Falls, Illinois, and his parents often fought over his father's drinking and philandering. They also fought over Manuel's treatment of Miniel. Manuel frequently beat Miniel from the time he was very young and some of these beatings were severe. In addition to the physical abuse, the children suffered from neglect. Jesse worked at a factory at night, leaving Manuel alone with the children. Manuel admits that he was an alcoholic and that he would often go to bars when Jesse was working. He would sometimes leave his children alone in the car outside a bar for hours at a time, even during the harsh Illinois winters. Other times, he would leave them alone in the house.

*Id.* at 345. We said that "Miniel's [a]ffidavits are mild when compared to the evidence presented by the petitioners in *Wiggins v. Smith*, [539 U.S. 510 (2003)], and *Williams v. Taylor*, [529 U.S. 362 (2000)]," *Miniel*, 339 F.3d at 347 n.10; and, accordingly, we held that "jurists of reason could not debate the correctness" of the determination that "Miniel's ineffective assistance claim fails for a lack of

prejudice." *Id.* at 346.  It is clear that the evidence Miniel presented in his habeas petition was stronger mitigating evidence than the evidence Swain presents in his habeas petition here.  Thus, like Miniel, Swain has not shown that he is entitled to habeas relief based on ineffective assistance of counsel.  For these reasons, we affirm the district court's decision to deny Swain habeas relief under 28 U.S.C. § 2254(d) on this claim.

## C.

The third issue on which the district court granted a COA is whether Swain defaulted his claim that the prosecution's use of a procedure known as a "jury shuffle" violated the Equal Protection Clause of the Fourteenth Amendment, and if he did not default this claim, whether he is entitled to relief.  We conclude that Swain procedurally defaulted this claim and therefore, we do not decide whether Swain would be entitled to relief.

At the start of voir dire in Swain's trial, the prosecution requested that the venire panel be shuffled, causing more white people to be at the front of the venire panel and making it less likely that a black person would be seated on the jury.  Swain now contends that this violated his right to equal protection of the laws.  However, Swain did not raise this issue in his direct appeal.  As a result, when Swain later presented this claim for the first time in his state habeas petition, the TCCA concluded that Swain had defaulted this claim.  Likewise, the federal district court held that "[g]iven that Swain has failed to establish either that he had good cause for failing to raise this claim or that a fundamental miscarriage of justice would occur if the Court declined to address the substance of the claim, the Court finds that this claim is barred from review under the doctrine of procedural default and that dismissal of [this] claim is appropriate." *Swain*, 2010 WL 1376910, at *12.

Swain contends that the district court erred because the state procedural bar is not regularly enforced, and thus, that it is not an adequate and

No. 10-70011

independent state bar to habeas relief in federal court.  *See Harris v. Reed*, 489 U.S. 255 (1989).  That argument, however, is foreclosed by this court's decision in *Dorsey v. Quarterman*, 494 F.3d 527 (5th Cir. 2007):

> The Texas Court of Criminal Appeals has held that record based claims not raised on direct appeal will not be considered in habeas proceedings.  *Ex parte Gardner*, 959 S.W.2d 189, 191 (Tex. Crim. App. 1996, *clarified on reh'g* Feb. 4, 1998).  This procedural rule was firmly established by *Gardner* before Dorsey's appeal following his trial in 2000.  This court recognizes that the *Gardner* rule sets forth an adequate state ground capable of barring federal habeas review.  *Busby v. Dretke*, 359 F.3d 708, 719 (5th Cir. 2004) and cases cited therein.  Accordingly, the district court erred by failing to apply the procedural bar to this issue.  Dorsey makes no claim of cause and prejudice and does not assert that a miscarriage of justice would result if the claim is not considered on its merits.

*Id.* at 532 (footnotes and citations omitted).[3]

Like the petitioner in *Dorsey*, Swain appealed his conviction after the TCCA decided *Gardner*; and, like Dorsey, Swain makes no claim of cause for failing to raise his jury shuffle claim on direct appeal, and does not assert that a miscarriage of justice would result if we did not consider the claim on its merits.  Therefore, we see no error in the district court's determination that Swain's jury shuffle claim is procedurally barred.

## IV.

For the foregoing reasons, we AFFIRM the district court's denial of habeas relief for Mario Swain.

---

[3] Swain cites several decisions of the TCCA that post-date our decision in *Dorsey* in which the TCCA allowed "an illegal sentence claim" to be raised for the first time in a habeas petition.  However, Swain's jury shuffle claim is a "record based claim[]" analogous to the *Batson* claim raised in *Dorsey*; it is not an "illegal sentence claim."  Therefore, we fail to perceive the relevance of those cases.