**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

United States Court of Appeals
Fifth Circuit

**F I L E D**
August 26, 2013

No. 11-70011

Lyle W. Cayce
Clerk

ROLANDO RUIZ,

Petitioner - Appellant

v.

WILLIAM STEPHENS, Director, Texas Department of Criminal Justice,
Correctional Institutions Division,

Respondent - Appellee

Appeal from the United States District Court
for the Western District of Texas

Before HIGGINBOTHAM, DENNIS, and ELROD, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

In 1995, a Texas jury sentenced Rolando Ruiz to death for the murder-for-hire of Theresa Rodriguez. Ruiz challenged his capital sentence in habeas proceedings under 28 U.S.C. § 2254, asserting a *Wiggins* claim for constitutionally ineffective assistance of counsel. The district court denied relief and Ruiz now seeks a certificate of appealability. We deny Ruiz's request.

No. 11-70011

## I.

In July 1992, Mark Rodriguez approached Rolando Ruiz at the home of a mutual friend, asking Ruiz if he "wanted to make some money."[1]  When Ruiz responded affirmatively, Mark[2] explained that he needed Ruiz to kill Theresa Rodriguez, the wife of Mark's brother, Michael Rodriguez.  Mark invited Ruiz into his brother Michael's car, and Michael introduced himself.  The trio then drove to the Macaroni Grill in San Antonio where Michael wanted the murder to take place.  Michael instructed Ruiz to kill and rob Theresa as the couple arrived at the restaurant on the night of Friday, July 10.  After Ruiz accepted the deal, Michael paid him $1000.00, promising another $1000.00 once Ruiz completed the murder.

In accordance with the plan, Ruiz went to the Macaroni Grill on Friday night.  However, after seeing a security guard, Ruiz called off the hit.  On the following day, Saturday, July 11, Ruiz called Michael, and the two agreed that Ruiz would carry out the murder as Michael and Theresa left the Nakoma Theatres that night.  In accordance with Michael's instructions, Ruiz went to the Nakoma Theatres.  However, after Michael and Theresa failed to show up at the agreed-upon time, Ruiz left.  He later called Michael, who explained that "something [had come] up."  On Monday, July 13, Michael instructed Ruiz to carry out the plan at the Nakoma Theatres on the following night, Tuesday, July 14.  At 7:00 p.m. on Tuesday, Mark called Ruiz to confirm that Mark and Michael were with Theresa at the Nakoma Theaters, and that the plan was on.

---

[1] The facts of Ruiz's crime are set forth in the district court's original opinion denying habeas relief as well as in Ruiz's post-arrest affidavits.  *See Ruiz v. Dretke*, No. SA-03-CA-303-OG, 2005 WL 2146119 (W.D. Tex. Aug. 29, 2005); Statement of Facts, vol. 31, at 136–41, *Ruiz v. State*, No. 72,072 (Tex. Crim. App. Feb. 25, 1998) [hereinafter Statement of Facts]; *id.*, vol. 32, at 238–45.

[2] Because many relevant parties in this case share common surnames, we generally refer to parties other than Ruiz by their first names.

No. 11-70011

Ruiz drove to the theaters and watched as the two brothers and Theresa got into Michael's car.  Ruiz trailed the trio in his truck as they drove home.  After Michael pulled into his driveway, Ruiz parked his truck at the neighboring house.  Ruiz walked up the driveway and pretended to ask for directions from Mark.  Ruiz then asked Mark: "do I do it?"  Mark responded: "Yes."  Ruiz walked up to the passenger side of Michael's car.  As Theresa stepped out of the car, she looked up at Ruiz and smiled at him.  Ruiz leveled a gun to her head and shot her once, killing her.  He then left the scene, got rid of his truck, played some basketball, and went to bed.  On Friday, July 17, Mark paid Ruiz the second $1000.00 installment.  Ruiz "spent it all on clothes and partying."

In the early hours of the morning on July 23, 1992, officers of the San Antonio Police Department arrested Ruiz at an apartment in San Antonio.[3] Thereafter, Ruiz gave police investigators three voluntary, written statements in which he admitted the above-referenced facts relating to his killing of Theresa Rodriguez.[4]  On October 21, 1992, a Bexar County grand jury indicted Ruiz on a single count of capital murder.[5]  After Ruiz retracted his earlier admissions, his case proceeded to a jury trial.[6]  At trial, Ruiz claimed that he had never confessed to Theresa's murder-for-hire but merely signed blank *Miranda* waiver forms.[7]  Though Ruiz admitted that he killed Theresa, he claimed that he had done so unintentionally after ingesting a large quantity of narcotics.[8]  The

---

[3] *Ruiz*, No. SA-03-CA-303-OG, 2005 WL 2146119, at *1 & n.1; Statement of Facts, *supra* note 1, vol. 31, at 79–85.

[4] *Ruiz*, No. SA-03-CA-303-OG, 2005 WL 2146119, at *1–3; *see also* Statement of Facts, *supra* note 1, vol. 31, at 136–41; *id.*, vol. 32, at 238–45.

[5] *Ruiz*, No. SA-03-CA-303-OG, 2005 WL 2146119, at *3.

[6] *Id.*

[7] *Id.*

[8] *Id.*

## No. 11-70011

prosecution responded by presenting testimony from police officers and civilian witnesses who confirmed that all three of Ruiz's written statements were knowing and voluntary.[9]  It also presented a variety of circumstantial evidence to prove that Ruiz had killed Theresa pursuant to an agreement with the Rodriguez brothers.[10]

On January 18, 1995, after deliberating for slightly over two hours, the jury returned its verdict, finding Ruiz guilty of capital murder.[11]  On the same date, the punishment phase of Ruiz's trial began.[12]  Under the applicable Texas capital sentencing statute, the jury had to make two unanimous determinations to sentence Ruiz to death.  First, it had to determine beyond a reasonable doubt that Ruiz posed a continuing danger to society.[13]  Second, it had to determine that taking into consideration all of the evidence, including the circumstances of Ruiz's offense, his character and background, and his personal moral culpability, there were insufficient mitigating circumstances to warrant a sentence of life imprisonment rather than a death sentence.[14]

The prosecution presented overwhelming evidence of Ruiz's character for violence.  Three close friends of Ruiz testified that Ruiz liked to fight and sometimes carried a gun.[15]  A police officer and an eyewitness testified about an incident on June 8, 1992, in which Ruiz pulled his then-girlfriend, Roxanne

---

[9] *Id.* at *4.

[10] *Id.* at *3–4.

[11] *Id.* at *4.

[12] *Id.*

[13] *Id.* at *6; *see also* Tex. Code Crim. Proc. art. 37.071 § 2(b)(1).

[14] *Ruiz*, No. SA-03-CA-303-OG, 2005 WL 2146119, at *6; *see also* Tex. Code Crim. Proc. art. 37.071 § 2(e).

[15] *Ruiz*, No. SA-03-CA-303-OG, 2005 WL 2146119, at *5.

No. 11-70011

Conway, out of her car, viciously beat her, stole the car, and proceeded to lead police on a brief chase before finally surrendering the vehicle.[16]  Numerous officers and guards from the Bexar County Adult Detention Center testified that while Ruiz was awaiting trial, he had joined the violent Texas Syndicate prison gang.[17]  They also testified that Ruiz and other gang members had viciously attacked prison guards and other inmates on at least three occasions in 1992 and 1993, with each incident resulting in serious injuries.[18]

The defense's sentencing stage strategy apparently focused on disproving the prosecution's case for Ruiz's violent character.  Ruiz's friend testified that Ruiz was a nice person.[19]  Ruiz's former basketball coach and teacher described Ruiz as an excellent, polite student.[20]  Ruiz's uncle and cousin testified that they had never known Ruiz to be violent, that they were unaware of his drug problems, and that they did not believe he deserved to die.[21]  Ruiz's mother testified that Ruiz had a "normal" childhood, had displayed no behavioral problems as a child, had expressed remorse for his crime, and was still a good person inside who deserved to live.[22]  She suggested that Ruiz began having problems at age 17, when he started abusing drugs.[23]  Finally, Roxanne Conway, Ruiz's former girlfriend, testified that Ruiz was always "very sweet" and "caring"

---

[16] *Id.*

[17] *Id.*

[18] *Id.*

[19] *Id.* at *6; Statement of Facts, *supra* note 1, vol. 35, at 978–82.

[20] *Ruiz*, No. SA-03-CA-303-OG, 2005 WL 2146119, at *6; Statement of Facts, *supra* note 1, vol. 35, at 1019–35.

[21] *Ruiz*, No. SA-03-CA-303-OG, 2005 WL 2146119, at *6.

[22] *Id.*

[23] *Id.*

No. 11-70011

to her, that he had apologized for assaulting her, and that she had forgiven him because she believed that his attack was due to his drug problem.[24]  On cross-examination, however, Conway admitted that at the time of the assault, she felt as though Ruiz was trying to kill her.[25]  Moreover, Conway acknowledged that she had suffered severe facial and dental injuries as a consequence of Ruiz's attack, which required stitches and multiple dental surgeries.[26]

In its closing statement to the sentencing jury, the prosecution observed that the defense's own witness, Roxanne Conway, underscored Ruiz's danger to society.[27]    The prosecution pointed out that the defense had proffered "no evidence . . . whatsoever of anything mitigating," noting that "there is nothing about [Ruiz's] background, his upbringing, his education, nothing about his personal moral culpability that diminishes in any way the fact that he deserves to pay [the death] penalty."[28] On January 20, 1995, after deliberating for slightly over 90 minutes, the jury found for the prosecution on both special issues, sentencing Ruiz to death.[29]

## II.

On February 18, 2004, Ruiz filed a federal habeas petition claiming that his trial counsel, Donald Mach, had failed to investigate and present mitigating evidence of Ruiz's abusive childhood.[30]  The district court reluctantly rejected

---

[24] *Id.*

[25] *Id.*

[26] *Id.*

[27] Statement of Facts, *supra* note 1, vol. 36, at 1184.

[28] *Id.* at 1186.

[29] *Ruiz*, No. SA-03-CA-303-OG, 2005 WL 2146119, at *2.

[30] *Id.* at *7.

No. 11-70011

Ruiz's ineffective assistance claim as procedurally defaulted, noting that Ruiz's state habeas counsel had presented the Texas Court of Criminal Appeals ("CCA") with a set of "boilerplate, frivolous" arguments that did not include an ineffective assistance claim.[31]   The court observed that Ruiz's claim was "potentially meritorious" and characterized his state habeas counsel's representation as "appallingly inept" and "egregiously deficient."[32] Nevertheless, the court rejected Ruiz's request for a stay while Ruiz returned to the CCA to raise his ostensibly defaulted claim, observing that "such an action would be an exercise in futility."[33]

Notwithstanding the district court's admonition, Ruiz filed a second petition for state habeas relief raising his ineffective assistance claim, along with affidavits and other supporting documentation.[34]   The CCA rejected Ruiz's petition in a summary order.[35]   Ruiz then returned to the federal district court on a Rule 60(b) motion for relief from judgment, arguing that the CCA's dismissal was an on-the-merits rejection of his ineffective assistance claim that undermined the district court's earlier judgment that the claim was procedurally defaulted.[36]   The district court rejected Ruiz's motion, defending its earlier opinion and finding that the CCA's summary dismissal rested on state

---

[31] *Ruiz v. Dretke*, No. 03-CV-303, 2005 WL 2620193, at *2 (W.D. Tex. Aug., 29, 2005).

[32] *Id.*

[33] *Ruiz v. Dretke*, No. 03-CV-303, 2005 WL 2402669, at *2 (W.D. Tex. Sept. 15, 2005).

[34] *See* Subsequent Application for Post-Conviction Relief, *Ex Parte Rolando Ruiz*, No. WR-27,328-03 (Tex. Crim. App. July 2, 2007).

[35] *See Ex Parte Rolando Ruiz*, No. WR-27,328-03 (Tex. Crim. App. July 6, 2007).

[36] *Ruiz v. Quarterman*, No. SA-03-CA-303-OG, 2007 WL 2437401, at *3 (W.D. Tex. July 10, 2007).

7

procedural grounds.[37]    Ruiz appealed to this Court, which reversed and remanded to the district court to consider Ruiz's ineffective assistance claim on the merits.[38]   As we explained in our remand opinion, the CCA's summary dismissal can reasonably be read as an on-the-merits rejection of Ruiz's ineffective assistance claim.[39]   Under *Michigan v. Long*, which establishes that a state court dismissal of a federal claim is "on the merits" if "the adequacy and independence of any possible state law ground is not clear from the face of the opinion," the CCA's summary dismissal thus pulled the rug out from under the district court's earlier judgment that Ruiz's claim was procedurally defaulted.[40]

On remand, Ruiz argued that his sentence required reversal under *Wiggins v. Smith*, claiming that Mach's failure to investigate and present evidence of Ruiz's "horrific" childhood amounted to deficient representation that prejudiced Ruiz at the sentencing stage of his trial.[41]   The district court, reviewing Ruiz's ineffective assistance claim *de novo*, agreed that Mach's trial performance was deficient.[42]   The court observed that Mach's own forensic psychologist, Dr. Harry Munsinger, had produced a report concluding that Ruiz suffered physical abuse as a child.[43]   The court rejected Mach's testimony that

---

[37] *Id.* at *3–4.

[38] *Ruiz v. Quarterman*, 504 F.3d 523, 532 (5th Cir. 2007).

[39] *Id.* at 527–28.

[40] *Id.* at 527 (quoting *Michigan v. Long*, 463 U.S. 1032, 1040–41 (1983)); *Coleman v. Thompson*, 501 U.S. 722, 735 (1991) ("In habeas, if the decision of the last state court to which the petitioner presented his federal claims appeared to rest primarily on resolution of those claims, or to be interwoven with those claims, and did not clearly and expressly rely on an independent and adequate state ground, a federal court may address the petition.").

[41] *Ruiz v. Thaler*, 783 F. Supp. 2d 905, 910–11, 936 (W.D. Tex. 2011).

[42] *Id.* at 913–17, 936–40.

[43] *Id.* at 938.

he saw "nothing mitigating" in Munsinger's report, observing that "[a]ny reasonably proficient attorney confronted with [similar] conclusions . . . should have reasonably perceived the potential for discovering mitigating evidence through an investigation into petitioner's background that went beyond merely interviewing the petitioner and his mother."[44]

However, the court concluded that Ruiz had not suffered material prejudice from Mach's deficient performance. First, the court observed, Ruiz's new habeas evidence "consisted almost exclusively of hearsay testimony" in which "petitioner's relatives merely repeated what petitioner had told them as a child, i.e., that he had been beaten by his step-father, forced by his mother's boyfriend to face the wall or stay in the bathroom, or there was no food at his home."[45] Second, the court reasoned, though the new mitigation evidence suggested that Ruiz's childhood was problematic, the heinous nature of Ruiz's offense, coupled with the prosecution's overwhelming evidence of Ruiz's violent character, ensured that "there is not even a remote possibility" that the new mitigating evidence would have altered the sentencing outcome.[46]

---

[44] *Id.* at 938–39.

[45] *Id.* at 918, 956; *see also id.* at 920, 936, 942, 945.

[46] *Id.* at 946–47. In his § 2254 petition, Ruiz also claimed that Mach failed to adequately investigate and present evidence linking Ruiz's crime to substance abuse. To support this claim, Ruiz introduced new testimony from Dr. Seth Silverman, a licensed psychiatrist. Dr. Silverman testified that Ruiz had murdered Ms. Rodriguez as part of an isolated bout of aggression triggered by cocaine abuse. The district court rejected Dr. Silverman's testimony, observing that Ruiz's aunt had previously testified that Ruiz had ingested narcotics specifically to "get the courage" to commit the murder. *Ruiz*, 783 F. Supp. 2d at 910–11, 924.

No. 11-70011

## III.

Ruiz comes before this Court seeking a certificate of appealability on his *Wiggins* claim.[47] Ruiz argues that the district court erred in rejecting swaths of his new evidence as hearsay, urging that if the court had properly considered all of the new evidence, it would have found prejudice.[48] The government disagrees.[49] It also claims that the district court erred in reviewing Ruiz's *Wiggins* claim *de novo*, observing that the CCA's summary dismissal of Ruiz's claim constituted an on-the-merits disposition that triggered the deferential § 2254(d) standard of review.[50]

Before a § 2254 petitioner can appeal, he must obtain a certificate of appealability ("COA").[51] To obtain a COA, a petitioner must make "a substantial showing of the denial of a constitutional right."[52] Where, as here, "a district court has rejected the constitutional claims on the merits, . . . [t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."[53] "The question of whether a COA should issue is a threshold inquiry that requires an overview of

---

[47] Application for a Certificate of Appealability at 15 n.4, *Ruiz v. Thaler*, No. 11-70011 (5th Cir. Aug. 4, 2011) ("On appeal, Mr. Ruiz seeks relief only on the claim, under *Wiggins v. Smith*, that Mr. Ruiz was prejudiced by the failure to conduct a reasonable mitigation investigation.").

[48] *Id.* at 33–34, 37–52.

[49] *See* Respondent-Appellee's Opposition to Application for Certificate of Appealability at 29–41, *Ruiz v. Thaler*, No. 11-70011 (5th Cir. Nov. 3, 2011).

[50] *Id.* at 18–21.

[51] *See* 28 U.S.C. § 2253(c)(1)(A).

[52] *Id.* § 2253(c)(2).

[53] *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

10

No. 11-70011

the claims in the habeas petition and a general assessment of their merits."[54] A full consideration of the merits is neither required nor permitted.[55] In death penalty cases, "any doubts as to whether a COA should issue must be resolved in the petitioner's favor."[56]

In determining whether to grant Ruiz's request for a COA on his *Wiggins* claim, we must bear in mind the standard of review under which the district court should have scrutinized that claim.[57] Hence, we begin by resolving the government's assertion that the district court should have applied the deferential § 2254(d) standard. Section 2254(d) applies to all claims that have been adjudicated "on the merits" by a state court.[58] In *Harrington v. Richter*, the Supreme Court clarified that a state court's summary dismissal of a federal claim qualifies as an "on the merits" disposition for purposes of § 2254(d) unless the dismissal clearly indicates that it rests on state-law grounds.[59] As we explained at length in our opinion remanding this case to the district court, the CCA's summary dismissal of Ruiz's *Wiggins* claim can reasonably be read as an

---

[54] *Kunkle v. Dretke*, 352 F.3d 980, 985 (5th Cir. 2003) (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003)) (internal quotation marks omitted).

[55] *Id.*

[56] *Ramirez v. Dretke*, 398 F.3d 691, 694 (5th Cir. 2005) (quoting *Hernandez v. Johnson*, 213 F.3d 243, 248 (5th Cir. 2000)) (internal quotation marks and alterations omitted).

[57] *See Pippin v. Dretke*, 434 F.3d 782, 787 (5th Cir. 2005).

[58] 28 U.S.C. § 2254(d).

[59] *Harrington v. Richter*, — U.S. — , 131 S.Ct. 770, 784–85 (2011) ("When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits [for purposes of § 2254(d)] in the absence of any indication or state-law procedural principles to the contrary.") (citing *Harris v. Reed*, 489 U.S. 255, 265 (1989)); *Johnson v. Williams*, 133 S.Ct. 1088, 1096 (2013) ("When a state court rejects a federal claim without expressly addressing that claim, a federal habeas court must presume that the federal claim was adjudicated on the merits — but that presumption can in some limited circumstances be rebutted.").

11

No. 11-70011

on-the-merits disposition.[60]   Under the *Richter* presumption, § 2254(d) thus applies to Ruiz's claim.[61]

Because § 2254(d) applies, the question presented by Ruiz's application for a COA is *not* whether reasonable jurists could debate the correctness of the CCA's summary dismissal of his *Wiggins* claim, but whether it is debatable that the CCA's order "was contrary to, or involved an unreasonable application of clearly established Federal law."[62] "It bears repeating that even a strong case for relief does not mean that a state court's contrary conclusion was unreasonable."[63]

## IV.

To prove that his sentence requires reversal under *Wiggins*, Ruiz must show that his trial counsel's failure to investigate and present mitigating evidence prejudiced the defense.[64]   To show prejudice, Ruiz must demonstrate

---

[60] *Ruiz v. Quarterman*, 504 F.3d 523, 527–28 (5th Cir. 2007).

[61] In concluding that § 2254(d) did not apply, the district court reasoned that the CCA's summary dismissal of Ruiz's ineffective assistance claim provided "no . . . state court judgment, much less any discernable state court findings of fact or conclusions of law, to which this Court could give deference under the AEDPA." *Ruiz v. Thaler*, 783 F. Supp. 2d 905, 916 (W.D. Tex. 2011).  But *Richter* emphatically rejected this line of reasoning:

As every Court of Appeals to consider the issue has recognized, determining whether a state court's decision resulted from an unreasonable legal or factual conclusion does not require that there be an opinion from the state court explaining the state court's reasoning.  And as this Court has observed, a state court need not cite or even be aware of our cases under § 2254(d).  Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief.

*Harrington*, 131 S.Ct. at 784.

[62] *See* 28 U.S.C. § 2254(d); *Feldman v. Thaler*, 695 F.3d 372, 377 (5th Cir. 2012); *see also Williams v. Taylor*, 529 U.S. 362, 410–11 (2000) ("An *unreasonable* application of federal law is different from an *incorrect* application of federal law.").

[63] *Richter*, 131 S.Ct. at 786.

[64] *Wiggins v. Smith*, 539 U.S. 510, 534 (2003).

No. 11-70011

a "reasonable probability that, but for counsel's unprofessional errors, the result of the [sentencing] proceeding would have been different."[65]  In determining whether Ruiz has made this showing, "we compare the evidence actually presented at sentencing with any additional mitigating evidence presented in the habeas proceeding."[66]  Specifically, we ask whether under the applicable state capital sentencing statute, "the additional mitigating evidence [is] so compelling that there [is] a reasonable probability that at least one juror could have determined that because of the defendant's reduced culpability, death [is] not an appropriate sentence."[67]  We agree with Ruiz that in assessing prejudice, "we need not . . . make the state-law evidentiary findings that would have been at issue at sentencing."[68]    Consequently, we conduct our analysis by "evaluat[ing] the totality of the evidence — both that adduced at trial, and the evidence adduced in the habeas proceedings."[69]

We begin our inquiry by reviewing the evidence Ruiz adduced in his habeas proceedings.[70]  The new evidence paints a bleak picture of Ruiz's

---

[65] *Id.*

[66] *Kunkle v. Dretke*, 352 F.3d 980, 991 (5th Cir. 2003) (internal quotation marks and citation omitted).

[67] *Id.*; *see also Blanton v. Quarterman*, 543 F.3d 230, 236 (5th Cir. 2008).

[68] *Wiggins*, 539 U.S. at 536; *see also Sears v. Upton*, 130 S.Ct. 3259, 3263 n.6 ("[W]e have . . . recognized that reliable hearsay evidence that is relevant to a capital defendant's mitigation defense should not be excluded by rote application of a state hearsay rule); *Green v. Georgia*, 442 U.S. 95, 97 (1979) ("Regardless of whether the proffered testimony comes within Georgia's hearsay rule, under the facts of this case its exclusion constituted a violation of the Due Process Clause . . . . The excluded testimony was highly relevant to a critical issue in the punishment phase of the trial.").

[69] *Wiggins*, 539 U.S. at 536 (internal quotation marks and citation omitted).

[70] The new testimony Ruiz introduced at his *federal* habeas hearing is presumably irrelevant to the § 2254(d)(1) inquiry.  *See Cullen v. Pinholster*, — U.S. — , 131 S.Ct. 1388 (2011).  However, the government does not raise this argument in its brief, and the federal habeas testimony is largely cumulative of the affidavits Ruiz submitted with his second state

13

No. 11-70011

childhood.  When Ruiz was a toddler, his mother Maria Rangel often left Ruiz at his grandmother's apartment for weeks to "live on . . . the street" and "hav[e] affairs with different men."[71]  On at least one occasion, a man came to spend the night with Maria and instructed Ruiz to face the wall or stay in the bathroom.[72]  Maria "hit [Ruiz] a lot,"[73] and Ruiz once complained to family members that he sometimes went hungry.[74]  When Ruiz was four, his aunt Griselda Gutierrez observed that he was "very skinny from not eating well" and "ha[d] lice in his hair."[75]  When Ruiz was six, Maria attempted to commit suicide in the bathroom of her apartment, slashing her wrists.[76]  According to Ruiz's aunt Rosa, Ruiz was present during his mother' suicide attempt and "knew what she had tried to do."[77]  Rosa took care of Ruiz while Maria recovered in the hospital.[78]

---

habeas petition.  *See* Subsequent Application for Post-Conviction Relief, *supra* note 34, Exhibits 5–7, 9.  As we conclude that Ruiz is not entitled to a COA on either the state habeas record or the supplemented federal habeas record, we see no need to deviate from the parties' briefing by reaching the *Cullen* issue.

[71] Subsequent Application for Post-Conviction Relief, *supra* note 34, Exhibit 6, at 2 (Affidavit of Dorothea Sanchez).

[72] Evidentiary Hearing Before the Honorable Orlando L. Garcia at 114–15 , *Ruiz v. Thaler*, No. SA-03-CV-303-0LG (W.D. Tex. Nov. 2, 2010) (Testimony of Griselda Gutierrez) [hereinafter Evidentiary Hearing].

[73] Subsequent Application for Post-Conviction Relief, *supra* note 34, Exhibit 7, at 4 (Affidavit of Rosa Ruiz); Evidentiary Hearing, *supra* note 72, at 170 (Testimony of Rosa Ruiz);

[74] Subsequent Application for Post-Conviction Relief, *supra* note 34, Exhibit 5, at 2 (Affidavit of Griselda Gutierrez); Evidentiary Hearing, *supra* note 72, at 113, 115 (Testimony of Griselda Gutierrez).

[75] Subsequent Application for Post-Conviction Relief, *supra* note 34, Exhibit 5, at 2 (Affidavit of Griselda Gutierrez).

[76] Evidentiary Hearing, *supra* note 72, at 171 (Testimony of Rosa Ruiz); Subsequent Application for Post-Conviction Relief, Exhibit 7, at 3 (Affidavit of Rosa Ruiz).

[77] Subsequent Application for Post-Conviction Relief, *supra* note 34, Exhibit 7, at 3 (Affidavit of Rosa Ruiz).

[78] Evidentiary Hearing, *supra* note 72, at 172–73 (Testimony of Rosa Ruiz).

No. 11-70011

When Ruiz was eleven, Maria moved in with Paul Rangel, whom she later married. According to Ruiz's grandmother, Paul "drank excessively and he used cocaine and marijuana."[79] Ruiz's cousin testified that Paul would beat Maria so badly that "she would have bruises on her arms and her face would be beat up and stuff."[80] Ruiz "didn't get along with Paul,"[81] and told his aunt Rosa that Paul would hit him.[82] However, Rosa never saw bruises on Ruiz.[83] Shortly after moving in with Paul, Maria placed Ruiz into a homeless shelter for an unspecified period of time.[84] At Rosa's insistence, Maria took Ruiz back.[85]

Ruiz spent much of his adolescence living with his extended family. When Ruiz was ten or eleven, Maria sent him to live with his aunt Rosa and her husband David for about a year.[86] When Ruiz was a teenager, Maria sometimes "kicked him out"[87] or "didn't open the door for [him]."[88] On these occasions, Ruiz

---

[79] Subsequent Application for Post-Conviction Relief, *supra* note 34, Exhibit 6, at 3 (Affidavit of Dorothea Sanchez).

[80] Evidentiary Hearing, *supra* note 72, at 289 (Testimony of Mark Molina).

[81] Subsequent Application for Post-Conviction Relief, *supra* note 34, Exhibit 6, at 3 (Affidavit of Dorothea Sanchez).

[82] Subsequent Application for Post-Conviction Relief, *supra* note 34, Exhibit 7, at 4 (Affidavit of Rosa Ruiz); Evidentiary Hearing, *supra* note 72, at 180–81 (Testimony of Rosa Ruiz).

[83] Evidentiary Hearing, *supra* note 72, at 181 (Testimony of Rosa Ruiz).

[84] *Id.* at 181–82; *see also* Subsequent Application for Post-Conviction Relief, *supra* note 34, Exhibit 7, at 3 (Affidavit of Rosa Ruiz).

[85] Evidentiary Hearing, *supra* note 72, at 181–82 (Testimony of Rosa Ruiz).

[86] *Id.* at 201–02 (Testimony of David Ruiz).

[87] *Id.* at 289 (Testimony of Mark Molina).

[88] *Id.* at 183 (Testimony of Rosa Ruiz).

would stay with Rosa and David, his grandmother, or other relatives.[89] When Ruiz was about eight or nine, Rosa's neighbor twice found him sleeping on Rosa's exposed porch in the early hours of the morning.[90] When Ruiz was fourteen or fifteen, his mother Maria made a second suicide attempt, this time by ingesting pills.[91]

By all accounts, Ruiz's grandmother, aunts, and uncles treated Ruiz like one of their own sons and daughters. Ruiz's grandmother offered to adopt him, although Maria rejected the offer.[92] Ruiz's uncle David testified that he loved Ruiz "a lot," that he was "pushy" with Ruiz just like with his own children, and that he made sure Ruiz went to school "every day."[93] Ruiz's cousin testified that she first met Ruiz "at a barbecue or at a family event," that Ruiz was "like [her] brother," and that her mother Rosa and father David treated Ruiz "very well" whenever Ruiz lived with them.[94] Another of Ruiz's cousins testified that his mother Rosa "was always concerned about [Ruiz,] like where is he at, how is he doing."[95] According to Ruiz's cousin, Rosa would reassure Ruiz that she could "take [him] in" if he had trouble at home, asking Ruiz to "[c]ome stay with us and be here with us."[96]

---

[89] Subsequent Application for Post-Conviction Relief, *supra* note 34, Exhibit 6, at 3–4 (Affidavit of Dorothea Sanchez); Evidentiary Hearing, *supra* note 72, at 201, 205, 225–27 (Testimony of Ramon Ruiz and David Ruiz).

[90] *Id.* at 151, 153–54 (Testimony of Yolanda Mendoza).

[91] *Id.* at 174 (Testimony of Rosa Ruiz); *see also* Subsequent Application for Post-Conviction Relief, *supra* note 34, Exhibit 7, at 3 (Affidavit of Rosa Ruiz)

[92] *Id.* at 115–116 (Testimony of Griselda Gutierrez).

[93] *Id.* at 204–05, 210 (Testimony of David Ruiz).

[94] *Id.* at 262, 264–65, 268 (Testimony of Angela Ruiz).

[95] *Id.* at 283 (Testimony of Mark Molina).

[96] *Id.* at 283–84.

No. 11-70011

Having examined the totality of the record, we make a threshold inquiry into the likelihood that Ruiz's sentencing outcome would have been different in light of the new mitigating evidence. Under Article 37.071 of the Texas Code of Criminal Procedure, Ruiz's sentencing jury could only impose a death sentence if it unanimously answered the mitigation issue set forth in § 2(e) in the negative.[97] Section 2(e) required Ruiz's sentencing jurors to determine whether "taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment without parole rather than a death sentence be imposed."[98]

In this case, the evidence bearing on Ruiz's character and the nature of his crime was unlikely to induce his jurors to vote for leniency. Ruiz shot Theresa Rodriguez in cold blood for a relatively small sum of cash, which he spent on clothes and partying. While awaiting trial, Ruiz joined the violent Texas Syndicate prison gang and participated in at least three vicious attacks on prison guards and inmates, all within the span of less than a year.[99] At trial, Ruiz showed no sincere remorse for killing Ms. Rodriguez, retracting virtually every admission he had made in his post-arrest confessions.[100] Ruiz's own character witness, Roxanne Conway, conceded that Ruiz had beaten her so severely that she feared for her life and had to undergo multiple surgeries.

---

[97] *See* Tex. Code Crim. Proc. art. 37.071 § 2(e).

[98] *Id.* The jury also had to find, unanimously and beyond a reasonable doubt, that Ruiz "would commit criminal acts of violence that would constitute a continuing threat to society." *See id.* at § 2(b)(1). As Ruiz's theory of prejudice is based entirely on the mitigation issue in § 2(e), we do not address the future dangerousness issue in our prejudice analysis.

[99] *Ruiz v. Dretke*, No. SA-03-CA-303-OG, 2005 WL 2146119, at *5 (W.D. Tex. Aug. 29, 2005).

[100] *See id.* at *3.

No. 11-70011

Against this evidence of Ruiz's brutal crime and violent and remorseless character,[101] Ruiz's sentencing jury would have had to weigh the mitigating value of the new habeas evidence bearing on Ruiz's childhood and adolescence. This evidence suggests that Ruiz endured hardship and deprivation at the hands of a self-absorbed mother and an abusive stepfather. However, it also indicates that Ruiz could rely on his extended family — especially his aunt Rosa and uncle David — for shelter, care, and affection. Ruiz's new evidence bears scant resemblance to that adduced in *Wiggins* and *Williams v. Taylor*, cases in which the Supreme Court found prejudice. In *Wiggins*, the petitioner furnished evidence that he suffered "physical torment, sexual molestation, and repeated rape" throughout his childhood and adolescence in foster care.[102] In *Williams*, the petitioner presented evidence that he was borderline mentally retarded, that his father severely and repeatedly beat him, that his parents were imprisoned for criminal neglect, and that he shuffled through abusive foster homes while his parents were incarcerated.[103] After a threshold inquiry into the record, we believe there is virtually no chance — let alone a "reasonable possibility" — that Ruiz's new habeas evidence would have affected the sentencing outcome.[104]

---

[101] Ruiz claims that this aggravating evidence is relevant only to the future dangerousness issue under § 2(b)(1), not to the separate mitigation issue under § 2(e). *See* Application for a Certificate of Appealability, *supra* note 47, at 17, 21, 34–37. We disagree. Aside from the fact that § 2(e) specifically instructs the sentencing jury to consider "all of the evidence, including the circumstances of the offense [and] the defendant's character," the Texas Court of Criminal Appeals has clarified that while the mitigation issue does not *require* jurors to consider aggravating circumstances, it permits them to do so. *Mosely v. State*, 983 S.W.2d 249, 263 n.18 (Tex. Crim. App. 1998).

[102] *Wiggins v. Smith*, 539 U.S. 510, 535 (2003).

[103] *Williams v. Taylor*, 529 U.S. 362, 370–71, 395–99 (2000).

[104] *Cf. Wiggins*, 539 U.S. at 534. Ruiz also suggests that his substance abuse at the time of the murder reduces his moral culpability. *See* Application for a Certificate of Appealability, *supra* note 47, at 14–15, 24, 32. Specifically, Ruiz points to Dr. Seth Silverman's testimony at the federal habeas hearing. *See id.* at 49 & n.11. Dr. Silverman suggested that Ruiz murdered Ms. Rodriguez as part of an episode of aggression triggered by

No. 11-70011

Our recent decision in *Miniel v. Cockrell* is instructive.  In *Miniel*, we denied the petitioner's request for a COA on his *Wiggins* claim, concluding that he could not show prejudice.[105]  Like Ruiz, Miniel presented new evidence of his troubled childhood at his habeas hearing:

> Miniel's biological mother, Carmen Cantu, abandoned him when he was only a few days old.  He was adopted by his aunt and uncle, Jesse and Manuel Miniel.  He grew up in a house with six adoptive siblings in Rock Falls, Illinois, and his parents often fought over his father's drinking and philandering.  They also fought over Manuel's treatment of Miniel.  Manuel frequently beat Miniel from the time he was very young and some of these beatings were severe.  In addition to the physical abuse, the children suffered from neglect.  Jesse worked at a factory at night, leaving Manuel alone with the children. Manuel admits that he was an alcoholic and that he would often go to bars when Jesse was working.  He would sometimes leave his children alone in the car outside a bar for hours at a time, even during the harsh Illinois winters.  Other times, he would leave them alone in the house.[106]

While we expressed little doubt that Miniel had suffered a rough childhood, we noted that his troubles were "mild when compared to the evidence presented by the petitioners in *Wiggins v. Smith* and *Williams v. Taylor*."[107]  We concluded that "[w]hen we compare Miniel's violent history including [his] cruel [murder] with the potential testimony of his family members that centered on his childhood abuse and substance abuse, we are satisfied there is no reasonable probability that the jury would have answered the special issues in a different

---

cocaine abuse.  Evidentiary Hearing, *supra* note 72, at 375–95 (Testimony of Dr. Seth Silverman).  However, as the district court observed, Ruiz's aunt Griselda Gutierrez had previously testified that Ruiz ingested cocaine specifically to "give him the courage" to commit the murder.  *See id.* at 119, 121 (Testimony of Griselda Gutierrez).  Even assuming that Dr. Silverman's new testimony is relevant to our § 2254(d)(1) inquiry, we agree with the district court that Dr. Silverman's findings have no mitigating value.

[105] *Miniel v. Cockrell*, 339 F.3d 331, 346–48 (5th Cir. 2003).

[106] *Id.* at 345.

[107] *Id.* at 345, 348 & n.10.

No. 11-70011

manner."[108]  We reach the same conclusion in the case at bar.[109]  Because there is no debatable issue on prejudice, we need not reach the question of whether Ruiz's trial counsel's failure to introduce the new habeas evidence at trial amounted to deficient representation.[110]

## V.

The motion for a certificate of appealability is DENIED.

---

[108] *Id.* at 347.

[109] Indeed, Miniel's case for prejudice is arguably more compelling than Ruiz's.  At his habeas hearing, Miniel introduced an expert report indicating that his impulse control was compromised by "mild to moderate brain damage." *Id.* at 345. Moreover, at sentencing, three witnesses testified that Miniel had genuinely reformed in prison, turning to religion. *See id.* at 337–38; Memorandum and Order at 5–6, *Miniel v. Cockrell*, No. H-00-435 (S.D. Tex. Oct. 29, 2001).  In this case, there is no evidence that Ruiz suffered from diminished mental capacity (other than as resulted from his voluntary drug use).  Moreover, Ruiz continued to demonstrate his penchant for violence while awaiting trial in prison.

[110] *Cf. Strickland v. Washington*, 466 U.S. 668, 697 (1984) ("[T]here is no reason for a court deciding an ineffective assistance claim to . . . address both components of the inquiry if the defendant makes an insufficient showing on one.").